## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| HOWARD KARP, derivatively on behalf of ZIMMER BIOMET HOLDINGS, INC., <br><br> Plaintiff, <br><br> v. <br><br> CHRISTOPHER B. BEGLEY, BETSY J. BERNARD, PAUL M. BISARO, GAIL K. BOUDREAUX, TONY W. COLLINS, DAVID C. DVORAK, MICHAEL J. FARRELL, DANIEL P. FLORIN, LARRY GLASSCOCK, ROBERT A. HAGEMANN, ARTHUR J. HIGGINS, MICHAEL W. MICHELSON, CECIL B. PICKETT, JEFFREY K. RHODES, KKR BIOMET LLC, TPG PARTNERS IV, L.P., TPG PARTNERS V, L.P., TPG FOF V-A, L.P., TPG FOF V-B, L.P., TPG LVB CO-INVEST LLC, and TPG LVB CO-INVEST II LLC, <br><br> Defendants, <br><br> and <br><br> ZIMMER BIOMET HOLDINGS, INC., <br><br> Nominal Defendant. | C.A. No.: <br><br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** <br><br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Howard Karp ("Plaintiff"), derivatively, on behalf of Zimmer Biomet

Holdings, Inc. ("ZBH" or the "Company"), alleges the following based on knowledge as to

Plaintiff and Plaintiff's conduct and upon information and belief as to all other matters and

based on the investigation conducted by Plaintiff's counsel, which included, among other

things, a review of U.S. Securities and Exchange Commission ("SEC") filings by ZBH,

FDA notices and letters to ZBH concerning ZBH's major manufacturing facilities,

securities analyst reports, press releases, media reports, and other public statements issued by, or about, the Company and the files in the action entitled *Shah v. Zimmer Biomet Holdings, Inc.*, 3:16-cv-00815 (N.D. Ind.).  The claims asserted herein are not duplicative of any claims asserted in the Chancery Court.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.      This is a stockholder derivative action brought on behalf of ZBH seeking to pursue remedies under the federal securities laws.  This is a case of illegal conduct in violation of federal securities laws by persons and entities who were contractual counterparties with ZBH.  Applicable securities laws allow ZBH to rescind such contracts and/or seek rescissory damages if rescission is impractical.

2.      ZBH was the product of a $13.4 billion mega-merger between competitors Zimmer Holdings, Inc. ("Legacy Zimmer") and Biomet, Inc. ("Legacy Biomet") that closed in June of 2015 (the "Merger").  Both companies were major medical device manufacturers headquartered in Warsaw, Indiana.  To effectuate the Merger, Legacy Zimmer (a publicly traded company) acquired LVB Acquisition, Inc. ("LVB") (a private company), which owned Legacy Biomet.  The combined entities and their subsidiaries became ZBH, headquartered in Warsaw, and publicly traded on the New York Stock Exchange (the "NYSE").  ZBH operates in more than 100 countries and now has approximately 18,500 employees.

3.      LVB, prior to the Merger, had been owned by approximately twenty-five private equity funds (the "Private Equity Funds") affiliated with four of the largest private

equity firms in the world: (i) Kohlberg Kravis Roberts & Co L.P. ("KKR"); (ii) The Blackstone Group L.P. ("Blackstone"); (iii) TPG Global, LLC ("TPG"); and (iv) Goldman Sachs Capital Partners ("GS Capital Partners").  In the Merger, those funds received stock constituting approximately 15% of the equity of the Company and, pursuant to an April 24, 2014 stockholders agreement (the "Stockholders Agreement"), received certain registration rights and the right to designate two members of ZBH's board of directors (the "Board") who were contractually permitted to share confidential information (related to ZBH's management, operations and finances) with those funds.  The two designee directors were designated by parent companies KKR and TPG.

4.      ZBH purported to develop and market products of the highest quality that were both safe and effective.  By early 2016, ZBH recognized that the growth story it was touting to investors after the Zimmer/Biomet merger in 2015 was not attainable due to "systemic" quality control issues identified by internal audits that directly affected Legacy Biomet's primary manufacturing facility responsible for supplying its most important products.  The officers and directors of ZBH – the overwhelming majority of whom were pharmaceutical industry executives – also knew an FDA inspection of that facility was imminent and that ongoing FDA scrutiny of ZBH's other facilities further heightened the Company's internal concerns.  The quality issues warranted major remediation of the Legacy Biomet facility, which could only be done if the facility were shut down thus causing production losses that would materially adversely impact ZBH revenue and earnings.

5.      Defendants not only failed to address these issues but had to have been aware of the internal audits and FDA scrutiny and chose to conceal them from the public,

thereby allowing ZBH's quarterly and annual financial statements in 2016 to falsely and misleadingly conceal the problems, risks and potential losses.

6.     The director and officer defendants had a duty to ensure that ZBH's financial statements and reports were true, accurate, complete, and not misleading.  These defendants have known since 2015, if not sooner, that ZBH's North Campus was at risk and that the failure to disclose these known and actual conditions and risk rendered ZBH's public financial statements misleading and artificially inflated the price of ZBH securities.

7.     The ZBH officer defendants named herein had employment contracts with ZBH which entitled them to compensation and benefits during their tenure.  These contracts included bonus pay and performance incentives.  The officer defendants named herein earned their contractual benefits in part at least through the performance of services and conduct that violated federal securities laws.  Similarly, the director defendants, who had understandings and agreements with ZBH to provide faithful, lawful director services, also earned benefits and compensation through services which involved violations of federal securities laws.

8.     The Insider Selling Defendants were the beneficiaries of and counter parties to the Stockholders Agreement, which was a contract between Insider Selling Defendants and/or their entity parents which, *inter alia*, allowed Insider Seller Defendants to demand registration of the equity they received in the Merger so they could sell their stock into the public markets.  The performance of the Stockholders Agreement by Insider Selling Defendants constituted violations of federal securities laws and were therefore inherently violative of the federal securities laws.

9.      The Insider Selling Defendants (the private equity fund affiliates of Defendants TPG and KKR) misused material nonpublic information and sold over $2.25 billion of ZBH stock during the three months before the FDA commenced an inspection of the facility.  The FDA inspection of the Legacy Biomet facility eventually forced ZBH to finally disclose the manufacturing facility deficiency issues because ZBH would soon be forced to close its flagship North Campus production facilities.  The risks and conditions concealed by the director and officer defendants concerning the quality issues at Legacy Biomet's North Campus facilities materialized as the extensive remediation resulted in substantial disruptions to operations and caused severe supply shortages, all of which negatively impacted ZBH revenues.  When ZBH publicly disclosed "supply shortages" and lowered growth, and the market learned about the quality issues at the Legacy Biomet facility, it caused ZBH's artificially inflated share price to plummet and wiped out billions of dollars in stockholder value.  The Insider Selling Defendants, of course, avoided these losses by selling their stock in June and August 2018 before such disclosures.

10.     Prior to public disclosure of the FDA issues, conditions and events, the Insider Selling Defendants sold their remaining holdings of ZBH common stock in two underwritten public offerings, which represented approximately 9.43% of ZBH's common stock outstanding.[1]  In the offering of ZBH common stock for sale by Insider Defendants only on June 13, 2016 ("June 2016 Offering"), the Insider Selling Defendants unloaded approximately $1.3 billion of their stock to the public and almost another $1 billion shortly

---

[1]     Seven funds affiliated with Blackstone sold their remaining shares of ZBH common stock in a $1 billion public offering in February 2016, which was prior to the start of the issuance of a series of materially misleading quarterly and annual reports by ZBH.  The funds affiliated with GS Capital Partners also participated in the February 2016 offering but only sold approximately half of their ZBH holdings in that offering.

thereafter in the offering of ZBH stock for sale by Insider Defendants only on August 9, 2016 ("August 2016 Offering").  The director and officer defendants permitted and assisted the Insider Selling Defendants to sell their stock by registering the shares for sale and allowing materially misleading quarterly and annual financial reports to be incorporated into registration statements and prospectuses issued for each offering.

11.     This stockholder derivative action seeks redress against the Company's current and former officers and directors under Section 29(b) and 21(D) of the Securities Exchange Act of 1934 (the "Exchange Act").  These Defendants also had a fiduciary duty to act in the Company's best interests, and to actively oversee the Company's operations and financial reporting to identify and prevent unlawful conduct, yet exposed ZBH to substantial liability by knowingly or recklessly permitting the Company and its employees to issue materially false and misleading financial statements and press releases.

12.     Plaintiff also seeks to recover, on behalf of ZBH, under Section 29(b) of the Exchange Act to void the Stockholders' Agreement and seek recovery of the insider trading profits earned by the Insider Selling Defendants and their respective affiliates in 2016 as a form of rescissory damages and for reimbursement of registration expenses ZBH paid for the June 2016 Offering and the August 2016 Offering and for rescission of any contractual indemnification owed to counterparties (*i.e.*, the Insider Seller Defendants) under the Stockholders Agreement.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under the laws of the United States and the State of Delaware.  This Court has jurisdiction over the subject matter of this action under its federal question jurisdiction pursuant to 28 U.S.C. § 1331.  This Court has exclusive

jurisdiction pursuant to Section 27 of the Exchange Act, 5 U.S.C. § 78(aa), because this action asserts claims under Section 29(b) of the Exchange Act, 15 U.S.C. § 78(n)(a).

14.     Jurisdiction is proper under Federal Rule of Civil Procedure 23.1 because Plaintiff was and currently is a stockholder of the Company at the time of the transactions described herein and the action is not one in which collusion is alleged for jurisdictional purposes.  As alleged herein, demand would have been futile.

15.     Venue is proper in this District under 28 U.S.C. § 1391(a) because the Company's by-laws in effect as of the time of the commencement of this litigation includes a provision designating the state and federal courts located within the State of Delaware as the sole and exclusive forum for Plaintiff to bring derivative litigation on behalf of the Company.

16.     Defendants directly or indirectly used the mails and means and instrumentalities of interstate commerce in connection with the acts, practices and courses of businesses alleged herein.

## PARTIES

### A.     Plaintiff

17.     Plaintiff is and has been a continuous beneficial owner of ZBH at all times relevant herein.  Plaintiff will fairly and adequately represent the interests of the stockholders who are similarly situated in enforcing the right of the corporation.  The action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

### B.     Nominal Corporate Defendant

18.     Defendant ZBH is a Delaware corporation headquartered in Warsaw, Indiana.

**C.      Officer Defendants**

19.      Defendant David C. Dvorak ("Dvorak") was, at all relevant times, CEO, President, and a director of ZBH.  Dvorak was also a member of the Integration Steering Committee ("ISC") in connection with the Merger.  He is herein sued herein both in his capacity as an officer and as a director.  Dvorak signed or authorized the signing of the Company's materially false and misleading registration statements in connection with the June 2016 Offering and the August 2016 Offering.  Dvorak previously served in various capacities as Legacy Zimmer's Group President, Global Businesses, Chief Legal Officer, Executive Vice President, Corporate Services, Chief Counsel and Secretary, Chief Compliance Officer, and SVP, Corporate Affairs and General Counsel.  Dvorak previously served as Senior Vice President, General Counsel and Corporate Secretary of STERIS Corporation.  Dvorak is an attorney who formerly practiced corporate law, focusing on mergers and acquisitions and on securities law.

20.      Defendant Daniel P. Florin ("Florin") was, at all relevant times, SVP and CFO of ZBH.  Florin was also a member of the ISC in connection with the Merger.  Florin signed or authorized the signing of the Company's materially false and misleading registration statements for the June 2016 Offering and the August 2016 Offering, as well as ZBH's Quarterly Reports on Forms 10-Q for ZBH's first and second calendar quarters in 2016.  Florin served as SVP and CFO of Legacy Biomet from June 2007 to June 2015.

21.      Defendant Tony W. Collins ("Collins") was, at all relevant times, Vice President, Corporate Controller and Chief Accounting Officer (Principal Accounting Officer) of ZBH.  Collins also signed or authorized the signing of the materially false and misleading registration statements and ZBH's Quarterly Reports on Form 10-Q for ZBH's

first and second calendar quarters in 2016.  Collins joined Legacy Zimmer in 2010 as Vice

President, Finance for the Global Reconstructive Division and U.S. Commercial

organization.

22.      Defendants Dvorak, Florin, and Collins (collectively the "Officer

Defendants"), because of their positions with the Company, possessed the power and

authority to control the contents of Zimmer's reports to the SEC, and the offering

materials used to sell the Insider Selling Defendants' ZBH shares in 2016, press releases,

and presentations to securities analysts, investment managers, and institutional investors,

*i.e.,* the market.  The Officer Defendants were provided with copies of ZBH's reports and

press releases alleged herein to be misleading prior to, or shortly after, their issuance

and had the ability and opportunity to prevent their issuance or cause them to be

corrected.  Because of their positions and access to material non-public information, the

Officer Defendants knew that the adverse facts specified herein had not been disclosed

to, and were being concealed from, the public, and that the positive representations which

were being made were then materially false *and/or* misleading.

### D.      Director Defendants

23.      Defendant Harry Glasscock ("Glasscock") was, at all relevant times,

Chairman of ZBH's Board and a member of the Audit Committee.  Defendant Glasscock

signed or authorized the signing of ZBH's materially false and misleading registration

statements filed with the SEC, which permitted and facilitated the sales by the Insider

Selling Defendants, pursuant to the terms of the Stockholders Agreement.  Glasscock was

Chairman of WellPoint, Inc. from 2005 until 2010 and President and CEO of

WellPoint, Inc. from 2004 to 2007.  Glasscock served as President and CEO of Anthem, Inc. from 2001 to 2004, and Chairman from 2003 to 2004.

24.     Defendant Christopher B. Begley ("Begley") was, at all relevant times, a director of ZBH, a member of the Audit Committee, and signed or authorized the signing of ZBH's materially false and misleading registration statements, which permitted and facilitated the sales by Insider Selling Defendants, pursuant to the terms of the Stockholders Agreement.  Begley was Executive Chairman of the Board of Hospira, Inc. from May 2007 until January 2012, and CEO from 2004 to March 2011.  Begley served in various positions with Abbott Laboratories between 1986 and 2004, most recently as SVP of Abbott's Hospital Products division.

25.     Defendant Betsy J. Bernard ("Bernard") was, at all relevant times, a director of ZBH, and signed or authorized the signing of ZBH's materially false and misleading registration statements, which permitted and facilitated the sales by Insider Selling Defendants, pursuant to the terms of the Stockholders Agreement.

26.     Defendant-Paul M. Bisaro ("Bisaro") was, at all relevant times, a director of ZBH, and signed or authorized the signing of ZBH's materially false and misleading registration statements, which permitted and facilitated the sales by the Insider Selling Defendants, pursuant to the terms of the Stockholders Agreement.  Bisaro has been Executive Chairman of Allergan pic (formerly Actavis plc) since July 2014.  Bisaro served in various roles as Chairman, President, CEO, and director of Actavis between 2007 and 2014.  Bisaro served as President, Chief Operating Officer and a member of the board of directors of Barr Pharmaceuticals, Inc. from 1999 to 2007, and General Counsel from 1992 to 1999.

27.     Defendant Gail K. Boudreaux ("Boudreaux") was, at all relevant times, a director of ZBH, member of the Audit Committee, and signed or authorized the signing of ZBH's materially false and misleading registration statements, which permitted and facilitated the sales by the Insider Selling Defendants, pursuant to the terms of the Stockholders Agreement.  Boudreaux has been CEO and Founder at GKB Global Health, LLC since 2015.  Boudreaux served as CFO of UnitedHealthcare from 2011 to 2014 and Executive Vice President of UnitedHealth Group from 2008 to 2015.  From 2005 to 2008, Boudreaux served as Executive Vice President, External Operations for Health Care Services Corporation, and prior to that served as President of Blue Cross and Blue Shield of Illinois.  Before joining HCSC, Boudreaux held various positions at Aetna.

28.     Defendant Michael J. Farrell ("Farrell") was, at all relevant times, a director of ZBH, and signed or authorized the signing of ZBH's materially false and misleading registration statements, which permitted and facilitated the sales by the Insider Selling Defendants, pursuant to the terms of the Stockholders Agreement.  Farrell has been CEO of ResMed Inc. since 2013, and President since 2011.  Farrell was SVP of the global business unit for sleep apnea therapeutic and diagnostic devices from 2007 to 2011, and before that held various senior roles in marketing and business development. Before joining ResMed in September 2000, Farrell worked in management consulting, biotechnology, chemicals and metals manufacturing at Arthur D. Little, Genzyme Corporation, The Dow Chemical Company, and BHP Billiton.

29.     Defendant Robert A. Hagemann ("Hagemann") was, at all relevant times, a director of ZBH, a member of the Audit Committee, and signed or authorized the signing of ZBH's materially false and misleading registration statements, which permitted

and facilitated the sales by the Insider Selling Defendants, pursuant to the terms of the Stockholders Agreement.

30.     Defendant Arthur J. Higgins ("Higgins") was, at all relevant times, a director of ZBH, and signed or authorized the signing of ZBH's materially false and misleading registration statements, which permitted and facilitated the sales by the Insider Selling Defendants, pursuant to the terms of the Stockholders Agreement.  Higgins has been a Consultant with the Blackstone Group since 2010 and had served as Chairman of the Board of Management of Bayer HealthCare AG from 2006 to 2010 and Chairman of the Bayer HealthCare Executive Committee from 2004 to 2010.  Prior to joining Bayer HealthCare, Higgins served as Chairman, President and CEO of Enzon Pharmaceuticals, Inc, and spent fourteen years with Abbott Laboratories, most recently as President of the Pharmaceutical Products Division from 1998 to 2001.

31.     Defendant Michael W. Michelson ("Michelson") was, at all relevant times, until his departure in mid-2016, a director of ZBH.  He resigned in 2016 upon sale of KKR's stake in ZBH.  He signed or authorized the signing of ZBH's materially false and misleading registration statements, which permitted and facilitated sales by the Insider Selling Defendants, pursuant to the terms of the Stockholders Agreement.  Michelson has been a Member of KKR Management LLC, a private equity investment manager and the general partner of KKR, since October 2009, and has worked for various KKR entities since 1981.  Michelson worked at Latham &Watkins, where he was involved in a broad corporate practice while specializing in management buyouts.  Michelson was a director of Legacy Biomet prior to the Merger.  Michelson was designated for nomination to ZBH's Board by the Private Equity Funds.

32.     Defendant Cecil B. Pickett ("Pickett") was, at all relevant times, a director of ZBH, and signed or authorized the signing of ZBH's materially false and misleading registration statements, which permitted and facilitated the sales by the Insider Selling Defendants, pursuant to the terms of the Stockholders Agreement. Pickett was President of Research and Development and a member of the board of directors of Biogen Idee Inc. from 2006 until 2009. Prior to joining Biogen Idee, Pickett held several senior R&D positions, including Corporate SVP of Schering-Plough Corp. and President of Schering-Plough Research Institute, as well as, several senior R&D positions at Merck & Co.

33.     Defendant Jeffrey K. Rhodes ("Rhodes"), was at all relevant times, a director of ZBH, and signed or authorized the signing of the ZBH's materially false and misleading registration statements filed with the SEC in 2016 to facilitate stock sales by Insider Seller Defendants, pursuant to the terms of the Stockholders Agreement. Rhodes is a partner at TPG and a leader of the firm's investment activities in the healthcare services, pharmaceutical and medical device sectors. Prior to joining TPG Capital, L.P. in 2005, Rhodes was with McKinsey & Company and Article27 LTD, a start-up software company. Rhodes was a director of Legacy Biomet prior to the Merger. Rhodes was nominated to ZBH's Board by the Private Equity Defendants.

34.     Defendants Glasscock, Begley, Bernard, Bisaro, Boudreaux, Farrell, Hagemann, Higgins, Michelson, Pickett, Dvorak, and Rhodes are herein referred to as the "Director Defendants."

**E.     Insider Selling Defendants**

35.     Defendant KKR Biomet LLC ("KKR Biomet") was, prior to the sale of its shares in mid-2016, a major stockholder of ZBH that owned approximately 7,529,640

shares of ZBH common stock as a result of the Merger.  Defendant KKR Biomet sold approximately 3,764,820 shares of stock in the June 2016 Offering for net proceeds of approximately $434 million and sold approximately 3,764,820 shares of stock in the August 2016 Offering for net proceeds of approximately $485 million.  Combined, Defendant KKR Biomet received net proceeds of approximately $919 million from the offerings.  Defendant KKR Biomet was identified in the registration statements and prospectuses for the June 2016 Offering and the August 2016 Offering as one of the "Selling Stockholders" offering ZBH common stock in the offerings.  Defendant KKR Biomet is an affiliate of KKR.

36.     Defendant TPG Partners IV, L.P. ("TPG Partners IV") was, prior to the sales of its shares in mid-2016, a major stockholder of ZBH and owned approximately 280,938 shares of ZBH common stock as a result of the Merger.  Defendant TPG Partners IV sold approximately 140,469 shares of stock in the June 2016 Offering for net proceeds of approximately $16.2 million and approximately 140,469 shares of stock in the August 2016 Offering for net proceeds of approximately $18 million.   In total, Defendant TPG Partners IV received net proceeds of $34.2 million from both offerings.

37.     Defendant TPG Partners V, L.P. ("TPG Partners V") was, prior to the sale of its shares in mid-2016, a major stockholder of ZBH and owned approximately 5,703,170 shares of ZBH common stock as a result of the Merger.  Defendant TPG Partners V sold approximately 2,851,585 shares of stock in the June 2016 Offering for net proceeds of approximately $328.8 million and approximately 2,851,585 shares of stock in the August 2016 Offering for net proceeds of approximately $367.8 million.  In total, Defendant TPG Partners V received net proceeds of $696.6 million in both offerings.

14

38.     Defendant TPG FOF V-A, L.P. ("TPG FOF V-A") was, prior to the sale of its shares in mid-2016, a major stockholder of ZBH and owned approximately 14,921 shares of ZBH common stock as a result of the Merger.   Defendant TPG FOF V-A sold approximately 7,461 shares of stock in the June 2016 Offering for net proceeds of approximately $860,000 and approximately 7,460 shares of stock in the August 2016 Offering for net proceeds of approximately $1 million.   In total, Defendant TPG FOF V-A received net proceeds of $1.8 million in both offerings.

39.     Defendant TPG FOF V-B, L.P. ("TPG FOF V-B") was, prior to the sale of its shares in mid-2016, a major stockholder of ZBH and owned approximately 12,033 shares of ZBH common stock as a result of the Merger.   Defendant TPG FOF V-B sold approximately 6,016 shares of stock in the June 2016 Offering for net proceeds of approximately $693,700 and approximately 6,017 shares of stock in the August 2016 Offering for net proceeds of approximately $776,100.   In total, Defendant TPG FOF V-A received net proceeds of $1.47 million in both offerings.

40.     Defendant TPG LVB Co-Invest LLC ("TPG LVB Co-Invest I") was, prior to the sale of its shares in mid-2016, a major stockholder of ZBH and owned approximately 1,325,152 shares of ZBH common stock as a result of the Merger.   Defendant TPG LVB Co-Invest I sold approximately 662,576 shares of stock in the June 2016 Offering for net proceeds of approximately $76.4 million and approximately 662,576 shares of stock in the August 2016 Offering for net proceeds of approximately $85.5 million.   In total, Defendant TPG LVB Co-Invest I received net proceeds of $161.9 million in both offerings.

41.     Defendant TPG LVB Co-Invest II LLC ("TPG LVB Co-Invest II") was, prior to the sale of its shares in mid-2016, a major stockholder of ZBH and owned approximately 15,496 shares of ZBH common stock as a result of the Merger.  Defendant TPG LVB Co-Invest II sold approximately 7,748 shares of stock in the June 2016 Offering for net proceeds of approximately $900,000 and approximately 7,748 shares of stock in the August 2016 Offering for net proceeds of approximately $1 million.  Combined, Defendant TPG LVB Co-Invest II received net proceeds of $1.9 million in both offerings.

42.     Defendants TPG Partners IV, TPG Partners V, TPG FOF V-A, TPG FOF V-B, TPG LVB Co-Invest I, and TPG LVB Co-Invest II, are herein collectively referred to as the "TPG Entities" or "TPG Defendants."  The TPG Defendants were all affiliates of TPG.  The TPG Defendants were all identified in the registration statements and prospectuses for the June 2016 Offering and the August 2016 Offering as "Selling Stockholders" offering shares of ZBH common stock being sold in the offerings.

43.     Defendant KKR Biomet and the TPG Defendants are herein collectively referred to as the "Insider Selling Defendants."

44.     The Officer Defendants, Director Defendants, and Insider Selling Defendants are herein collectively referred to as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### A.     ZBH's Post-Merger Growth Story

45.     At all relevant times, ZBH's organic revenue growth rate was the most important metric to the Company's stock price and was closely followed by investors and securities analysts.  When the plans for the Merger were announced in 2014, increased

organic revenue growth was one of the rationales offered to justify combining the second and fourth largest providers of orthopedic products.  ZBH promised that cross-selling opportunities that would accelerate organic revenue growth well above market level (which was generally deemed to be 3%).

46.     But shortly after the Merger closed in June of -2015, the reality diverged from the "story."  ZBH's growth rate had declined, causing much concern among investors in the fall of 2015.  As organic revenue growth languished, so did the Company's stock price.

47.     Moreover, the Officer Defendants knew about and took action with respect to its facilities to address deficiencies that presented material risks to ZBH's ability to manufacture key products and thereby meet its organic growth goods publicly reported.

48.     In early 2016, ZBH and its executives sought to convince investors that in the second half of 2016 ZBH's organic revenue growth would return to and then exceed market level.  Investors were told that ZBH had successfully integrated the commercial operations of Legacy Zimmer and Legacy Biomet in the fourth calendar quarter of 2015. This was publicly hailed as a crucial post-Merger action that would allow ZBH to generate and capture the benefits from the cross-selling opportunities needed to return ZBH to above market level growth in the second half of 2016.  Predictably, ZBH's stock price increased through the first, second and third calendar quarters of 2016.

49.     In early 2016 and up to the devastating disclosures in late 2016, ZBH and the Officer Defendant aggressively insisted that the rationale of the Merger was being realized.  In press releases, conference calls with investors, and discussions with analysts, the Officer Defendants claimed that the cross-selling opportunities were taking hold, that

organic revenue growth was reaccelerating, and that the organic revenue growth rate would return to market level growth and exceed market level in the second half of 2016 and 2017. The SEC filings during 2016 however omitted material facts about the existing conditions and regulatory risks at the primary Legacy Biomet North Campus. Investors were not informed that ZBH was at material risk of seeing revenues and profits fall materially short of projections because ZBH had to first extensively remediate the FDA's Quality System ("QS") deficiency issues at the North Campus noted by the FDA before full production capacity could be realized.

**B.  ZBH's Facility Problems and the FDA**

50.  No later than July 15, 2015 the Defendants began to fully apprehend the ongoing issues at the North Campus as reflected by ZBH's admissions in a December 21, 2016 "Response To FDA 483 Observations Issued To Zimmer Biomet Warsaw North Campus, November 22, 2016" (the "Response"). ZBH admitted in the Response that:

(a)  ZBH audited Legacy Zimmer sites, legacy Biomet sites and commenced "network process audits" beginning July 15, 2015;

(b)  In 2015, ZBH scheduled "corporate quality audits" to be performed at North Campus in first half of 2016;

(c)  A remediation program with approved funding was established in July 2016;

(d)  "Corporate Audits" reports for the North Campus were issued on March 31, 2016, April 13, 2016 and June 7, 2016. The audit reports identified a total of 4 "critical observations," 35 "major observations" and 7 "minor observations;"

(e)     "Post Market Surveillance Reconsideration Program Resources"
were approved in May 2016; and

(f)     "Quality Assurance Resource Additions" were approved in July
2016.

51.     The Response was signed by David Kunz, Senior Vice President, and copied
to Defendant Dvorak.

52.     In the first half of 2016, ZBH and its facilities were under intense FDA
scrutiny.  The FDA had identified serious quality deficiencies in the fall of 2015 during an
inspection of the primary Legacy Zimmer West Campus (the "West Campus").  The
inspection had resulted in the issuance of a serious FDA Form 483 ("FDA 483") identifying
a large number of repeat observations from prior FDA inspections in October and
November of 2015 and in April and May 2014.  In private correspondence to the FDA in
December 2015 and February 2016, ZBH acknowledged the severity of the "systemic
issues" with the West Campus' QS and outlined extensive remediation work that would
purportedly occur during 2016 continue through at least June 2017.  In the first half of
2016, substantial remediation and corrective actions were underway to address highly
critical FDA inspections of Legacy Zimmer facilities in Puerto Rico (in November 2015)
and Montreal (in January 2016).

53.     In part because of their ongoing problem with the West Campus, after the
Merger closed, ZBH corporate management requested that corporate audits of the North
Campus' QS be conducted in early 2016.  Audit reports issued on March 31, April 13, and
June 7, 2016, alerted ZBH's corporate management to even far worse "systemic issues"

with respect to the QS and the North Campus.[2]  The findings contained in the audit reports were neither minor nor technical.  Rather, ZBH admitted that the findings "self-identified major compliance-related issues in areas such as design controls, sterile packaging, complaint handling, nonconforming material, and [corrective and preventive actions ("CAPAs")]."[3]  The "major-compliance-related issues" covered a wide-range of the primary components to a quality management system.

54.     On June 7, 2016, ZBH knew that FDA quality inspection of Legacy Biomet's flagship North Campus was imminent.  ZBH knew this because, as a manufacturer of class III devices, the Company's manufacturing facilities are subject to mandatory biennial inspections by law and the last FDA inspection of that facility had concluded on June 30, 2014.  Moreover, that prior inspection had resulted in the FDA issuing observations on an FDA Form 483, which ZBH had not remediated.  A majority of ZBH's then directors also knew of the imminent FDA inspection because of their extensive experience as executive officers and/or directors of major pharmaceutical companies and familiarity with FDA regulations and regulatory practices and procedures.

55.     Because of the magnitude of the "systemic issues" identified in the corporate audit reports, it was obvious to ZBH officers and directors that ZBH would not be able to remediate the issues prior to the expected FDA inspection of the North Campus.  Not only was ZBH already saddled with "systemic issues" with the West Campus' QS (as well as the Puerto Rico and Montreal facilities), but the issues identified with the North Campus' QS

---

[2]     This information was not publicly disclosed until ZBH admitted these facts in a letter to the FDA dated December 21, 2016 (the "December 21, 2016 Letter") (a partially redacted copy received from the FDA is attached hereto as Exhibit ("Ex.") A).

[3]     Ex. A (December 21, 2016 Letter).

were far more severe.  The North Campus QS would ultimately need over a year of extensive remediation work costing over $300 million during which its production capabilities would be severely limited.

56.     As a medical device company, compliance with FDA regulations, including quality manufacturing regulations, was one of the most important aspects of ZBH's operations.  For this reason, the Company's proxy materials explained, "The full Board considers specific risk topics, including risk-related issues pertaining to laws and regulations enforced by the [FDA]."  The proxy materials also indicated that the directors received "detailed regular reports … that include discussions of the risks and exposures," and that directors were "routinely informed of developments that could affect our risk profile."

57.     ZBH, its executives, and its Board were nearly all seasoned veterans of the medical device industry and well versed in FDA quality regulations, compliance, and the risks associated with not complying with FDA regulations.  As a result, ZBH and its senior officers and directors understood the significance and magnitude of the issues uncovered by the corporate audit reports.

58.     The products produced and distributed at the North Campus included Legacy Biomet's most important products.  As one of the Company's officers would later admit, the products provided ZBH with is most competitive opportunities and were "strategically relevant" to ZBH's ability to accelerate organic revenue growth.  ZBH could not meet existing demand for its products while promptly and meaningfully remediating these issues.  In other words, the Company could not simultaneously fix the issues and

generate the supply necessary to support the cross selling that ZBH was telling investors would drive organic revenue growth.

###    C.    ZBH's Materially False and Misleading SEC Filings

59.    The Defendant Directors all participated in some stage of the preparation, drafting, reviewing, signing and approval of ZBH's Quarterly Report on Form 10-Q for the quarter ended March 30, 2016 ("Q1 2016 10-Q"); ZBH's Quarterly Report on Form 10-Q for the quarter ended June 30, 2016 ("Q2 2016 10-Q"); ZBH's Prospectus, Supplemental Prospectuses Registration Statements, which were materially false and misleading as set forth below:

(a)    The Q1 2016 10-Q was signed by Defendants Collins and Florin on May 10, 2016;

(b)    The certifications pursuant to Section 302 of the Sarbanes Oxley Act of 2002 in the Q1 2016 10-Q were signed by Defendant Dvorak in his capacity as ZBH's President and Chief Executive Officer and Defendant Florin in his capacity as Senior Vice President and Chief Financial Officer on May 10, 2016;

(c)    Defendants Dvorak and Florin signed the "Certification Pursuant to 18 U.S.C. Section 1350" on May 10, 2016 which was an exhibit to the Q1 2016 10-Q;

(d)    The Q2 2016 10-Q was signed by Defendants Florin and Collins on August 8, 2016;

(e)    The certifications pursuant to Section 302 of the Sarbanes Oxley Act of 2002 were signed by Defendant Dvorak in his capacity as ZBH's President and Chief Executive officer and Defendant Florin in his capacity as Senior Vice President and Chief Financial Officer on August 8, 2016;

(f)     Defendants Dvorak and Florin signed the "Certification Pursuant to 18 U.S.C. 1350" on August 8, 2016 which was an exhibit to the Q2 2016 10-Q; and

(g)     Defendants Dvorak, Florin, Collins, Glasscock, Begley, Bernard, Bisaro, Boudreaux, Farrell, Hagemann, Higgins, Michaelson, Pickett and Rhodes signed or authorized the signing of the ZBH registration statements filed with the SEC for the June 2016 Offering and the August 2016 Offering, which included materially false and misleading prospectuses and incorporated by reference the materially misleading Annual Report on Form 10-K and quarterly reports on Form 10-Q.

60.     Throughout 2016, ZBH filed an Annual Report on Form 10-K for the annual period ended December 31, 2015 and three Quarterly Reports on Form 10-Q for the periods ended March 31, 2016, June 30, 2016, and September 30, 2016, respectively (the latter 10-Q however is not implicated in this action).  Each of the filings and their respective contents were governed by SEC rules and regulations, including but not limited to Regulation S-K: Item 303 Requirements (management's discussion and analysis of financial condition and results of operations); and Item 503 Requirements (Prospectus summary and risk factors).

### 1.     Regulatory Requirements of ZBH's SEC Findings

### a.     S-K Item 303 Requirements

61.     Item 303 imposes an affirmative duty on issuers to disclose "events" or "uncertainties" that will have a material or unfavorable impact on the registrant's future revenue.[4]

---

[4]     *See* 17 C.F.R. § 229.303(a)(3)(i) and (ii); Mgmt's Discussion and Analysis of Fin. Condition and Results of Operation, Exchange Act Release No. 6835 ("S.E.C. Release No. 6835"), 1989 WL 1092885, at *4 (May 18, 1989).

62.     Specifically, Item 303 requires issuers to disclose in the registration statement any "trend, demand, commitment, event or uncertainty" that is "both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operations."[5]  Pursuant to Item 303(a), for a fiscal year, a registrant has an affirmative duty to: (i) describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which the income was so affected; (ii) describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.  If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.[6]

63.     Thus, even a one-time event, if "reasonably expect[ed]" to have a material impact of results, must be disclosed.  Examples of required disclosures include: "[a] reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.[7]

---

[5]     *See id.*; 17 C.F.R. § 229.303(a)(3)(ii).

[6]     *See* 17 C.F.R. § 229.303(a)(3)(i) and (ii); *see also* S.E.C. Release No. 6835, 1989 WL 1092885, at *8 (May 18, 1989) ("Other non-recurring items should be discussed as unusual or infrequent events or transactions that materially affected the amount of reported income from continuing operations.") (citation and quotation omitted).

[7]     S.E.C. Release No. 6835, 1989 WL 1092885, at *4.

Accordingly, as the SEC has repeatedly emphasized, the "specific provisions in Item 303 [as set forth above] require disclosure of forward-looking information."[8] Indeed, the SEC has stated that disclosure requirements under Item 303 are "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company" and "a historical and prospective analysis of the registrant's financial condition ... with particular emphasis on the registrant's prospects for the future."[9] Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects."[10]

### b.    Item 503 Requirements Applicable to ZBH 2016 Offering Materials

64.    Item 503 is intended "to provide investors with a clear and concise summary of the material risks to an investment in the issuer's securities."[11] Accordingly, Item 503 requires that offering documents "provide under the caption 'Risk Factors' a discussion of the most significant factors that make the offering speculative or risky."[12] The discussion of risk factors must be specific to the particular company and its

---

[8]    *Id.* at *3.

[9]    *Id.*; *see also id.* at *17.

[10]    *See* Comm'n Guidance Regarding Mgmt's Discussion and Analysis of Fin. Condition and Results of Operations, S.E.C. Release No. 8350, 2003 WL 22996757, at *11 (Dec. 19, 2003).

[11]    *See* Offering Reform, S.E.C. Release No. 8501, 2004 WL 2610458, at *86 (Nov. 3, 2004).

[12]    17 CFR § 229.503(c).

operations and should explain how the risk affects the company and/or the securities being offered.  Generic or boilerplate discussions do not tell the investors how the risks may affect their investment.[13]

65.    Item 503, thus, provides that a registration statement must disclose all known material risks that are "specific to the particular company and its operations."[14] Item 503(c) warns issuers: "[d]o not present risks that could apply to any issuer or any offering."[15]

### c.    Regulatory Requirements Applicable to the Periodic Financial Statements Incorporated by Reference into Registration Statements

66.    Item 8 of Form 10-K and Item 1 of Form 10-Q, via reference to Regulation S-X [17 C.F R. § 210] required ZBH to file with the SEC financial statements prepared in conformity with Generally Accepted Accounting Principles ("GAAP").  Regulation S-X [17 C.F.R. § 210.4-01.(a)(l)] states that financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate.

67.    Item 7 of Form 10-K and Item 2 of Form 10-Q required ZBH to furnish the information called for under Item 303 of Regulation S-K [17 C.F.R. § 229.303], *Management's Discussion and Analysis of Financial Condition and Results of Operations.* In 1989, the SEC issued interpretative guidance associated with the requirements of Item 303 of Regulation S-K, which states, in pertinent part, as follows:

---

[13]    Statement of the Comm'n Regarding Disclosure of Year 2000 Issues and Consequences by Pub. Cos., Inv. Advisers, Inv. Cos., & Mun. Sec. Issuers, 1998 WL 425894, at *14 (July 29, 1998).

[14]    *Id.*

[15]    17 CFR § 229.503(c).

> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

68. The *Management's Discussion and Analysis* ZBH filed with the SEC on Forms 10-K and 10-Qs filed in 2016 contained materially false and misleading disclosures about the Company's operating performance and failed to disclose material events and uncertainties associated with ZBH's major brands and internal control weaknesses, which were then known to management and were reasonably likely to have a material effect on the Company's future operating results.

69. Item lA of Form 10-K and Form 10-Q required ZBH to furnish the information called for under Item 503 of Regulation S-K [17 C.F.R. § 229.503], *Risk Factors.* Item 503 of Regulation S-K required ZBH to disclose the most significant matters making an investment in the Company risky.

70. The Forms 2015 10-K and 10-Qs ZBH filed with the SEC in 2016 failed to disclose material risks associated with its manufacturing operations.

71. Item 9A of Form 10-K and Item 4 of Form 10-Q required ZBH to furnish the information called for under Item 307 of Regulation S-K [17 C.F.R. § 229.307], *Disclosure Controls and Procedures,* and Item 308 of Regulation S-K [17 C.F.R. § 229.308], *Internal Control over Financial Reporting*.

72. The Registration Statements issue in June and August 2016 which incorporated by reference all previously filed ZBH periodic financial reports filed with the SEC did not comply with the above statutory mandates.

### d.     The June 2016 Offering Materials

73.     On June 13, 2016, ZBH and the Insider Selling Defendants offered for sale 11,116,533 shares of ZBH common stock in the June 2016 Offering at a price of $115.85 per share for net proceeds of approximately $1.28 billion.

74.     The June 2016 Offering was conducted pursuant to a registration statement on Form S-3 that ZBH filed with the SEC on February 4, 2016 (the "Registration Statement").  The Registration Statement was signed by Defendants Dvorak, Florin and Collins and the Director Defendants.

75.     ZBH supplemented the Registration Statement with a Preliminary Prospectus Supplement filed with the SEC on June 13,2016 (the "June Preliminary Prospectus")and a Final Prospectus Supplement filed with the SEC on June 15, 2016 (the "June Final Prospectus" and together with the Registration Statement and the June Preliminary Prospectus, the "June Offering Materials").

76.     The June Offering Materials incorporated by reference, among others: (i) ZBH's Annual Report on Form 10-K for the year ended December 31, 2015 (filed on February 29, 2016) (the "2015 10-K"); and (ii) ZBH's Q1 2016 10-Q.

77.     The June Offering Materials were defective because they contained untrue statements of material facts and/or omitted to state facts necessary to make the statements made therein not misleading and the June Offering Materials were not prepared in accordance with the rules and regulations governing their preparation.

78.     The June Preliminary Prospectus and the June Final Prospectus both represented that any "forward-looking statements are based upon the current beliefs and expectations of our management" and purported to identify, among others, the following

generic and boilerplate "risks and uncertainties:" (i) "the risks and uncertainties related to our ability to successfully integrate the operations, products, employees and distributors of the legacy companies;"(ii) "our ability to remediate matters identified in any inspectional observations or warning letters issued by the FDA;" and (iii) "the success of our quality and operational excellence initiatives."

79.     The above (purported) risk warning was materially false and/or misleading and/or omitted material facts necessary to make the statement not misleading.  Specifically, the (purported) risk warning was materially false and/or misleading when made because it failed to warn investors: (i) that ZBH would be unable to satisfy demand for its products while remediating the QS deficiencies at the North Campus; and (ii) that ZBH would have to disrupt production and distribution of key products because ZBH was manufacturing, sterile packing, and distributing products from the North Campus despite knowing that "systemic issues" with the QS had not been adequately remediated and knowing that an FDA inspection of the facility was imminent.

80.     Additionally, the statement set forth above in the June Offering Materials was materially false and/or misleading because it failed to disclose: (i) that there were "systemic issues" with the QS at the North Campus requiring highly disruptive, time consuming and costly remediation and corrective activities; (ii) that ZBH was not taking prompt and meaningful actions to remediate and correct the "systemic issues" at the North Campus; (iii) that an FDA inspection of the Legacy Biomet North Campus was imminent; (iv) that ZBH would be unable to meet demand for its products while remediating the "systemic issues" with the QS at the North Campus; and (v) that as a result of the

foregoing, ZBH was unable to accelerate organic revenue growth to above market level in the second half of 2016.

81.     The 2015 10-K, which was incorporated by reference into the June Offering Materials, contained a number of stale risk factors that purported to caution investors about potential risks and uncertainties and implied that such risks had not occurred.  Additionally, the Q1 2016 10-Q, which was also incorporated by reference into the June Offering Materials, directed investors to the same risk warnings contained in the 2015 10-K and added: "*There have been no material changes in our risk factors from those disclosed in our Annual Report* on Form 10-K for the year ended December 31, 2015."

82.     The June Offering Materials incorporated the following risk factor from the 2015 10-K and the Q1 2016 10-Q (which had been incorporated from the 2015 10-K):

> Successful integration of Biomet and anticipated benefits of the Biomet merger are not assured and integration matters could divert attention of management away from operations. Also, the merger could have an adverse effect on our business relationships.
>
> Although Biomet has become an indirect wholly owned subsidiary  of ours, it is initially continuing its operations on a basis that is  separate  from  the  legacy Zimmer operations. There can be no assurance that Biomet will be able to maintain and grow its business and operations ...
>
> Our ability to realize the anticipated benefits of the Biomet merger will depend, to a large extent, on our ability to integrate the legacy businesses.  Integrating and coordinating certain aspects of the operations and personnel of Biomet with ours involves complex operational, technological and personnel-related challenges.  This process is time-consuming and expensive, disrupts the businesses of both companies and may not result in the full benefits expected by us, including cost synergies expected to arise from supply chain efficiencies and overlapping general and administrative functions.  The *potential difficulties, and resulting costs and delays,* include:

- managing a larger combined company;
- consolidating corporate and administrative infrastructures;
- *issues in integrating manufacturing, warehouse and distribution facilities,*

research and development and sales forces;
- difficulties attracting and retaining key personnel;
- loss of customers and suppliers and inability to attract new customers and suppliers;
- unanticipated issues in integrating information technology, communications and other systems;
- incompatibility of purchasing, logistics, marketing, administration and other systems and processes; and
- unforeseen and unexpected liabilities related to the merger or Biomet's business.

Additionally, the integration of our and Biomet's operations, products and personnel may place a significant burden on management and other internal resources. The attention of our management may be directed towards integration considerations and may be diverted from our day-to-day business operations, and matters related to the integration may require commitments of time and resources that could otherwise have been devoted to other opportunities that might have been beneficial to us. The diversion of management's attention, and any difficulties encountered in the transition and integration process, could harm our business, financial condition and operating results.

Even if our businesses are successfully integrated, we may not realize the full benefits of the merger, including anticipated synergies, cost savings or growth opportunities, within the expected timeframe or at all. In addition, we expect to incur significant integration and restructuring expenses to realize synergies. However, many of the expenses that will be incurred are, by their nature, difficult to estimate accurately. These expenses could, particularly in the near term, exceed the savings that we expect to achieve from elimination of duplicative expenses and the realization of economies of scale and cost savings. Although we expect that the realization of efficiencies related to the integration of the businesses may offset incremental transaction, merger-related and restructuring costs over time, we cannot give any assurance that this net benefit will be achieved in the near term, or at all.

> Any of these matters could adversely affect our businesses or harm our financial condition, results of operations or business prospects.

83.     The statements were materially false and/or misleading when made for the same reasons set forth above.  Additionally, those statements were knowingly and/or recklessly materially false and/or misleading because, despite warning about "potential difficulties, and resulting costs and delays"  relating to  "issues in integrating manufacturing ... facilities," ZBH  did  not  update its risk  disclosure in  light of the  new information from the corporate audit reports (issued on March 31, April 13, and June 7, 2016) alerting ZBH management to the fact that the QS at the Legacy Biomet North Campus were not compliant with FDA standards/regulations and it would require substantial time and money (in excess of one year and $300 million) to remediate the "systemic issues" and result in substantial disruption to the supply of essential Legacy Biomet products.

84.     The June Offering Materials incorporated the following risk factor representation from the 2015 10-K and the Q1 2016 10-Q (which had been incorporated from the 2015 10-K):

> We are subject to various governmental regulations relating to the manufacturing, labeling and marketing of our products, non-compliance with which could adversely affect our business, financial condition and results of operations.

> * * *

> *Both before and after a product is commercially released, we have ongoing responsibilities under FDA regulations. Compliance with the  FDA's requirements, including the Quality System regulation,* recordkeeping regulations, labeling  and promotional requirements and adverse event reporting regulations, *is subject to continual review and is monitored rigorously through periodic inspections by the FDA, which may result in observations on Form 483, and in some cases warning letters, that require corrective action, or other forms of  enforcement.  If the FDA were to conclude*

*that we are not in compliance with applicable laws or regulations,* or that any of our medical devices are ineffective or pose an unreasonable health risk, the FDA could ban such medical devices, detain or seize adulterated or misbranded medical devices, order a recall, repair, replacement, or refund of payment of such devices, refuse to grant pending premarket approval applications, refuse to provide certificates to foreign governments for exports, and/or require us to notify healthcare professionals and others that the devices present unreasonable risks of substantial harm to the public health.  The FDA may also impose operating restrictions on a company-wide basis, enjoin and restrain certain violations of applicable law pertaining to medical devices and assess civil or criminal penalties against our officers, employees or us. The FDA may also recommend prosecution to the DOJ.  Any adverse regulatory action, depending on its magnitude, may restrict us from effectively marketing and selling our products and could have a material adverse effect on our business, financial condition and results of operations.

In 2012, we received a warning letter from the FDA citing concerns relating to certain processes pertaining to products manufactured at our Ponce, Puerto Rico manufacturing facility.  In June 2015, Biomet received a warning letter from the FDA that requested additional information to allow the FDA to evaluate the adequacy of Biomet's responses to certain Form 483 observations issued following an inspection of Biomet's Zhejiang, China manufacturing facility in January 2015.  As of December 31, 2015, these warning letters remained pending. Until the violations are corrected, we may become subject to additional regulatory action by the FDA, the FDA may refuse to grant premarket approval applications and/or the FDA may refuse to grant export certificates, any of which could have a material adverse effect on our business, financial condition and results of operations. Additional information regarding these and other FDA regulatory matters can be found in Note 20 to the consolidated financial statements.

85.     The above statement was materially false and/or misleading when made for the same reasons set forth above.

86.     The June Offering Materials incorporated the following risk factor from the 2015 10-K and the Q1 2016 10-Q (which had been incorporated from the 2015 10-K):

Interruption of our manufacturing operations could adversely affect our business, financial condition and results of operations.

We have manufacturing sites all over the world.  In some instances, however, the manufacturing of certain of our product lines is concentrated in one or more of our plants. Damage to one or more of our facilities from weather or natural disaster-related events, or *issues in our manufacturing arising from* failure to follow specific internal protocols and procedures, *compliance concerns relating to the Quality System regulation and Good Manufacturing Practice requirements,* equipment breakdown or malfunction or other factors *could adversely affect our ability to manufacture our products.  In the event of an interruption in manufacturing, we may be unable to move quickly to alternate means of producing affected products or to meet customer demand.  In the event of a significant interruption, for example, as a result of a failure to follow regulatory protocols and procedures, we may experience lengthy delays in resuming production of affected products* due primarily to the need for regulatory approvals.  As a result, we may experience loss of market share, which we may be unable to recapture, and harm to our reputation, which could adversely affect our business, financial condition and results of operations.

87.  The above statement was materially false and/or misleading when made for the same reasons set forth above.

88.  The Company's 2015 10-K, under the heading "Government Regulation and Compliance," contained the following statement:

... [W]e have ongoing responsibilities under FDA regulations. The FDA reviews design and manufacturing practices, labeling and record keeping, and manufacturers' required reports of adverse experiences and other information to identify potential problems with marketed medical devices. *We are also subject to periodic inspection by the FDA for compliance with the FDA's Quality System regulations among other FDA requirements,* such as restrictions on advertising and promotion.  *The Quality System regulations govern the methods used in, and the facilities and controls used for, the design, manufacture, packaging and servicing of all finished medical devices intended for human use.*  If the

FDA were to conclude that we are not in compliance with applicable laws or regulations, or that any of our medical devices are ineffective or pose an unreasonable health risk, the FDA could require us to notify healthcare professionals and others that the devices present unreasonable risks of substantial harm to the public health, order a recall, repair, replacement, or refund payment of such devices, detain or seize adulterated or misbranded medical devices, or ban such medical devices.

89.     The Company's Q1 2016 10-Q contained the following statement (which was substantially the same as a statement contained in the 2015 10-K) under the heading "Regulatory Matters, Government Investigations and Other Matters:"

*FDA warning letters:* In September 2012, Zimmer received a warning letter from the U.S. Food and Drug Administration ("FDA") citing concerns relating to certain processes pertaining to products manufactured at our Ponce, Puerto Rico manufacturing facility.  In June 2015, Biomet received a warning letter from the FDA that requested additional information to allow the FDA to evaluate the adequacy of Biomet's responses to certain Form 483 observations issued following an inspection of Biomet's Zhejiang, China manufacturing facility in January 2015.  We have provided detailed responses to the FDA as to our corrective actions and will continue to work expeditiously to address the issues identified by the FDA during inspections in Ponce and Zhejiang.  As of March 31, 2016, these warning letters remained pending.  Until the violations are corrected, we may be subject to additional regulatory action by the FDA, including seizure, injunction and/or civil monetary penalties. Additionally, requests for Certificates to Foreign Governments related to products manufactured at the Ponce and Zhejiang facilities may not be granted and premarket approval applications for Class III devices to which the quality system regulation deviations at these facilities are reasonably related will not be approved until the violations have been corrected.  *In addition to responding to the warning letters described above, we are in the process of addressing various FDA Form* 483 *inspectional observations at certain of our manufacturing facilities.*  The ultimate outcome of these matters is presently uncertain.

90.     The 2015 l0-K contained the following statement about the Company's outlook for 2016: "We expect pro forma sales growth will improve in the last half of the year compared to the first half as our sales force stabilizes, we take advantage of cross-selling opportunities and we anniversary out of many sales force dissynergies caused by the merger."

91.     Under the heading "2016 Outlook," the Company's Q1 2016 10-Q also contained the following statement that was substantially similar to the above statement from the 2015 10- K: "We expect pro forma sales growth will improve in the second half of the year compared to the first half as our sales force stabilizes, we take advantage of cross-selling opportunities and we anniversary out of the impact of product line divestitures and certain sales force dissynergies caused by the merger."

92.     The statements above incorporated by reference into the June Offering Materials were materially false and misleading and/or omitted material facts necessary to make the statement not misleading.  Specifically, the statements were materially false and/or misleading when made because they failed to disclose: (i) that there were "systemic issues" with the QS at the North Campus requiring highly disruptive, time consuming and costly remediation and corrective activities; (ii) that ZBH was not taking prompt and meaningful actions to remediate and correct the "systemic issues" at the North Campus; (iii) that an FDA inspection of the Legacy Biomet North Campus was imminent; (iv) that ZBH was unable to meet demand for its products while remediating  the "systemic issues" with the QS at the North Campus; and (v) that as a result of the foregoing, ZBH was unable to accelerate organic revenue growth to above market level in the second half of 2016.

93.     The June Offering Materials were materially false and misleading because they failed to disclose the following known adverse trends and/or uncertainties that ZBH was required to disclose under Item 303, including: (i) that there were "systemic issues" with the QS at the North Campus requiring highly disruptive, time consuming and costly remediation and corrective activities; (ii) that ZBH was not taking prompt and meaningful actions to remediate and correct the "systemic issues" at the North Campus; (iii) that an FDA inspection of the Legacy Biomet North Campus was imminent; (iv) that ZBH was unable to meet demand for its products while remediating the "systemic issues" with the QS at the North Campus; and (v) that as a result of the foregoing, ZBH was unable to accelerate organic revenue growth to above market level in the second half of 2016.

94.     Additionally, the June Offering Materials were materially false and misleading because they failed to disclose the additional known adverse trend and/or uncertainty in violation of Item 303: that the Legacy Biomet North Campus required substantial remediation, which would take considerable time and money (which would exceed more than a year and cost upwards of $300 million), which was particularly evident to ZBH Collins in light of the significant time and funds that were being expended for the purported ongoing remediation activities for the Legacy Zimmer West Campus.

### e.     The August 8, 2016 Quarterly Report on Form 10-Q

95.     On August 8, 2016, ZBH filed the Q2 2016 10-Q with the SEC. The Q2 2016 10-Q reaffirmed the Company's financial results previously announced on July 28, 2016, and was signed by Defendants Florin and Collins.

96.     Under the heading "Regulatory Matters, Government Investigations and Other Matters," the Q2 2016 10-Q contained the following statement:

*FDA warning letters:* In September 2012, Zimmer received a warning letter from the U.S. Food and Drug Administration ("FDA") citing concerns relating to certain processes pertaining to products manufactured at our Ponce, Puerto Rico manufacturing facility.  In June 2015, Biomet received a warning letter from the FDA that requested additional information to allow the FDA to evaluate the adequacy of Biomet's responses to certain Form 483 observations issued following an inspection of Biomet's Zhejiang, China manufacturing facility in January 2015.  In May 2016, Zimmer received a warning letter from the FDA related to observed non-conformities with current good manufacturing practice requirements of the Quality System regulation at our facility in Montreal, Quebec, Canada.  We have provided detailed responses to the FDA as to our corrective actions and will continue to work expeditiously to address the issues identified by the FDA during inspections in Ponce, Zhejiang and Montreal.  As of June 30, 2016, these warning letters remained pending.  Until the violations are corrected, we may be subject to additional regulatory action by the FDA, including seizure, injunction and/or civil monetary penalties. Additionally, requests for Certificates to Foreign Governments related to products manufactured at the Ponce facility may not be granted and premarket approval applications for Class III devices to which the quality system regulation deviations at these facilities are reasonably related will not be approved until the violations have been corrected. *In addition to responding to the warning letters described above, we are in the process of addressing various FDA Form* 483 *inspectional observations at certain of our manufacturing facilities.*  The ultimate outcome of these matters is presently uncertain.

97.    The Q2 2016 10-Q also contained the following statement:

*Results for the Three and Six Month Periods ended June 30, 2016*

Our results have been significantly impacted by the Biomet merger.  In 2016, *we have continued to make progress in our* commercial and *operational integration across all geographies and functions.*  As we expected, our sales growth rates were below market growth rates in the first half of 2016, *but we saw sequential improvement from the second half of 2015 and expect to end 2016 at or above market growth rates.*

98.     The above statements were materially false and/or misleading and/or omitted material facts necessary to make the statement not misleading.  Specifically, the statements were materially false and/or misleading  when made because they failed to disclose: (i) that there were "systemic issues" with the QS at the North Campus requiring highly disruptive, time consuming and costly remediation and corrective activities; (ii) that ZBH was not taking prompt and meaningful actions  to remediate and correct the "systemic issues" at the North Campus; (iii) that an FDA inspection of the Legacy Biomet North Campus was imminent; (iv) that ZBH was unable to meet demand for its products while remediating the "systemic issues" with the QS at the North Campus; and (v) that as a result of the foregoing, ZBH was unable to accelerate organic revenue growth to above market level in the second half of 2016.

99.     The Q2 2016 10-Q also directed readers to risk warnings in the 2015 10-K and contained the following statement: "Except as set forth below, *there have been no material changes in our risk factors from those disclosed in our Annual Report on Form 10-K for the year ended December 31, 2015.*"[16]

100.    The above statement, along with the incorporated risk warning statements from the 2015 10-K quoted above were materially false and/or misleading when made for the same reasons set forth above.  As explained above, these (purported) risk warnings were

---

[16]    The Q2 2016 10-Q added one risk warning purporting to caution investors that "[w]e may not be able to effectively integrate newly acquired businesses into our operations or achieve expected cost savings or profitability."  Three other changes/updates to the risk warnings pertained to unrelated matters such as the United Kingdom's referendum on whether to leave the European Union, future sales by stockholders (*i.e.*, KKR and TPG) into the public market, and a prior governmental Foreign Corrupt Practices Act investigation of Biomet by the SEC and DOJ which eventually in 2017 resulted in a Deferred Prosecution Agreement for ZBH and approximately $23 million in fines.

materially false and/or misleading when made because they failed to warn investors that, among others: (i) the Company would have to disrupt production/distribution of products because ZBH was manufacturing and distributing products from the North Campus – despite "systemic issues" with the QS – when  an FDA inspection of the facility was imminent; and (ii) the Company would be unable to continue satisfying the demand for its products while remediating the "systemic issues" with the North Campus' QS identified in corporate audit reports on March 31, April 13, and June 7, 2016.

### f.      The August 2016 Offering Materials

101.     On August 9, 2016, ZBH and the Insider Selling Defendants offered for sale 7,440,675 shares of ZBH common stock at a price of $129.75 per share for net proceeds of $960 million.

102.     On February 4, 2016, ZBH filed the Registration Statement on Form S-3 with the SEC in connection with the August 2016 Offering.  The Registration Statement was signed by Defendants Dvorak, Florin and Collins and the Director Defendants.

103.     ZBH supplemented the Registration Statement with a Preliminary Prospectus Supplement filed with the SEC on August 9, 2016 (the "August Preliminary Prospectus") and a Final Prospectus Supplement filed with the SEC on August 11, 2016 (the "August Final Prospectus" and together with the Registration Statement and the August Preliminary Prospectus, the "August Offering Materials").

104.     The August Offering Materials incorporated by reference, among others, ZBH's 2015 10-K, Q1 2016 10-Q, and Q2 2016 10-Q.

105.     The August Offering Materials were defective because they contained untrue statements of material facts and/or omitted to state facts necessary to make the

statements made therein not misleading and the August Offering Materials were not prepared in accordance with the rules and regulations governing their preparation.

106.    The August Offering Materials repeated and incorporated the false/misleading statements from the June Offering Materials (which were incorporated by reference from the Company's 2015 10-K and Q1 2016 10-Q) contained above.  Those statements were materially false or misleading and/or omitted material facts required to be stated therein, for the same reasons set forth above.

107.    The August Offering Materials incorporated the same statements from the Q2 2016 10-Q described herein, which were materially false or misleading and/or omitted material facts required to be stated therein, for the same reasons set forth herein.

108.    The August Offering Materials were also materially misleading because they omitted material information required to be disclosed under Reg. S-K Item 303.  As alleged above, with respect to the June Offering Materials, the August Offering Materials failed to disclose the same known adverse trends and/or uncertainties identified above that were omitted from June Offering Materials.

**D.    The Conditions and Events Concealed by Defendants Were Eventually Revealed, Causing ZBH's Stock Price to Plummet, Wipe Out Billions of Market Capitalization, and Expose ZBH to Potential Liability and Related Cost and Distraction from Securities Class Action Litigation**

109.    When ZBH reported its Q3 2016 financial results on October 31, 2016, the Company shocked investors and analysts by reporting decelerating revenue growth in Q3 2016 and lowering its organic revenue growth guidance for Q4 2016.  During a conference call that day, Defendants Dvorak and Florin blamed "variable sales performance" in Q3

2016 on "unanticipated supply constraints, related to our transitioning supply chain infrastructure:"

> *Variable commercial performances by our sales were in part caused by unanticipated supply constraints, related to our transitioning supply chain infrastructure.* This resulted in shortfalls of needed implants and additional instrument sets, to fully exploit sales opportunities in key product categories.
>
> In response to this challenge, we've accelerated work to enhance certain aspects of our supply chain infrastructure as we harmonize and optimize our sourcing, manufacturing and quality management systems.

110.   On this news, the price of ZBH common stock fell $17.75 per share, or nearly 14%, to close on October 31, 2016, at $105.40 per share, on usually heavy trading volume.  The disclosure wiped out more than $3.4 billion of market capitalization in a single day.

111.   On November 8, 2016, ZBH was forced to admit that the supply shortages and lowered organic revenue growth guidance of Q4 2016 had been caused by issues with the Legacy Biomet North Campus.  That day, ZBH issued a statement in response to the analyst report and admitted that issues with North Campus had actually been factored into the lowered guidance ZBH announced on October 31, 2016 (even though ZBH had omitted this fact when announcing the guidance):

> … [A]s discussed on the third quarter earnings conference call, the Company has also accelerated work to enhance certain aspects of its supply chain infrastructure as it harmonizes and optimizes its sourcing, manufacturing and quality management systems. *While these ongoing efforts have in instances led to certain product shipment delays, including product manufactured at the legacy Biomet operation in Warsaw, Indiana*, the Company is making excellent progress in addressing the issues and many of the shipment delays are already resolved and the impacted product has been released for commercial distribution.  The

> Company expects to return to full shipping capacity with the
> impacted products over the next few weeks.

112.    On this news, shares of ZBH fell another $2.62 per share, to close on
November 8, 2016 at $101.3 per share, on usually heavy trading volume.  The disclosure
wiped out roughly $500 million worth of market capitalization in a single day.

113.    ZBH admitted that the deceleration of revenue growth had been, at least in
part, caused by "operational process enhancements that have resulted in various shipment
delays."  An analyst report issued that same day reported that, based on the analyst's
investigation, Zimmer's problems were caused in part by product shipment holds imposed
by the FDA during its inspection of North Campus.  Accordingly, the analyst downgraded
Zimmer's stock.

114.    In a securities class action captioned *Shah v. Zimmer Biomet Holdings, Inc.*,
3:16-cv-00815 (N.D. Ind.), plaintiffs filed securities law claims on behalf of investors who
purchased ZBH stock between June 7, 2016 and November 7, 2016 and suffered
investment losses.  In that case, the plaintiffs allege that ZBH and its officers and directors
made false and misleading statements to a class of stock purchasers during the class period,
in violation of the Exchange Act and the Securities Act of 1933.

115.    In particular, plaintiffs allege that during the summer and fall of 2016, the
defendants made false and misleading statements touting ZBH's improving performance
and post-merger business prospects, while failing to disclose that the Company was
managing a host of regulatory and compliance problems that jeopardized its ability meet
guidance, and that one of its core facilities (North Campus) needed a complete overhaul,
severely limiting product supply.

116.    The securities plaintiffs' allegations are further supported by two former employees of the Company who worked at North Campus during remediation.  One such employees, a senior manager, alleges that she was encouraged by at least one executive to "concoct" a story about ZBH's revenue shortfall and blame certain employees for the problems, which she refused to do.

117.    By order dated September 26, 2018 (Docket 119), Judge Philip P. Simon denied various defendants' motions to dismiss the securities claims.  With respect to the Section 10(b) claims against ZBH and its officers, the Court held that the plaintiffs alleged with particularity that (i) ZBH and the defendants omitted information from their statements regarding the Company's quality and compliance problems that they had a duty to disclose, (ii) that the information they failed to disclose was material, and (iii) that they acted with scienter, or intent to defraud.  *See* 348 F. Supp. 3d 821 (N.D. Ind. 2018).

118.    The Court further held that the plaintiffs stated claims for securities violations under the Securities Act of 1933 against twelve directors in connection with the June and August 2016 secondary offerings, including a majority of the current Board (8 out of 11), arising out of false and misleading statements contained in the registration statements they signed (and related offering materials) for the June and August 2016 KKR and TPG offerings.  As of the filing of this complaint, the *Shah* litigation remains pending, and the directors named therein (the same directors named herein) are exposed to massive personal liability.

### F.    Director and Officer Defendants' Unlawful Execution Of Contractual Duties Harmed the Company

119.    A company like ZBH can suffer real reputational damage from a prolonged period of artificially inflated stock that is significantly greater that any regulatory fines or

other penalties that it may occur.  *See* Jonathan M. Karloff, D. Scott Lee and Gerald S. Martin, The Cost to Firms of Cooking the Books, Journal of Financial and Quantitative Analysis, Vol. 43, No. 3 (Sept. 2008).  In fact, the reputational penalty is "7.5 times the sum of all penalties imposed through the legal and regulatory system" and "[f]or each dollar that a firm misleadingly inflated its market value, on average, it loses this dollar when its misconduct is revealed, plus an additional $3.08. . . . [of which] $2.71 is due to lost reputation."  *Id.* (emphasis added).  This reputational damage increases the longer the public company' stock is artificially high.  *Id.*

120.    Each of the Officer Defendants and Director Defendants, by virtue of his or her position as a director and/or officer, owed to ZBH and its stockholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the control, management, and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  As explained herein, the conduct of the Officer Defendants and Director Defendants complained of herein involves a knowing and culpable violation of their fiduciary obligations by allowing the ZHB to enter into various contractual agreements that were violative of the federal securities laws and permitting ZBH to make false and misleading public statements, in absence of good faith on their part, and a reckless disregard for their duties to ZBH and its stockholders that the Defendants were aware or should have been aware posed a risk of serious injury to the Company.

121.    The Officer and Director Defendants breached their contractual obligations and fiduciary duties by failing to heed numerous, obvious red flags of inaccurate financial statements inadequate financial controls and concealment and omission of material adverse information and by failing to ensure that policies and procedures were in place to ensure the

Insider Selling Defendants and the ZBH fiduciaries who served the interests of the Insider

Selling Defendants were not unjustly enriched with stock sales at inflated prices while in

possession of material adverse non-public.

122.    As a result of the Director and Officers Defendants' breaches detailed

herein, the Company has suffered loss and damage and has become the subject of

stockholder lawsuits ZBH is exposed to potentially massive liability.

### G.    Demand Futility

123.    Demand would be futile in this action because the Board could not exercise

independent and disinterested business judgment in responding to a demand.  The Board

currently consists of eleven directors, eight of whom have been directors of ZBH since at

least 2013.

124.    ZBH's Board currently consists of eleven members: Defendants Begley,

Bernard, Boudreaux, Farrell, Glasscock, Hagemann, Higgins, Michaelson; and non-

Defendants Bryan C. Hanson (director, President and CEO since 2017); Maria Teresa

Hilado and Sayed Jafrey (the latter two have been directors since 2018).

125.    Demand is further excused because a majority of the Directors Defendants

face a substantial likelihood of liability for the claims herein.

126.    The Directors Defendants who, in the aggregate make up a majority of

ZBH's current board face substantial liability under Section 11 of the Securities Act of

1933 for signing materially misleading and false Registration Statements.  Under that

statute, the Director Defendants herein have only limited defenses to liability.  Accordingly,

these directors would not authorize a suit that could uncover facts exposing all director

Defendants to Section 11 liability potentially for hundreds of millions of dollars that would

likely exceed any applicable D&O insurance coverage and thus expose these defendants to potentially ruinous personal liability with no indemnification.

127.    Defendants Begley, Boudreaux, Glasscock and Hagemann were during 2015 and 2016, the members of ZBH's Audit Committee and charged with assisting the Board relating to ZBH's financial statements and ensuring the accuracy of disclosures to stockholders.  The Audit Committee members were obligated to review and approve the Company's annual Forms 10-K and quarterly Forms 10-Q, other Company filings, as well as the Company's earnings press releases during the Relevant Period.  However, the Audit Committee failed properly executes their duties, causing the Company to make materially false and misleading statements.  As such, Defendants Begley, Boudreaux, Glasscock and Hagemann face an even greater likelihood of liability for their breaches of fiduciary duties, including their duties of good faith, fair dealing, and loyalty, and other illegal acts.

128.    ZBH's annual proxy statement in 2016 described "Board Role In Risk Oversight" as follows:

> The Board of Directors oversees the risk management processes that have been designed and are implemented by or executives to determine whether those processes are functioning as intended and are consistent with our business and strategy.  The Board executes its oversight responsibility for risk management directly and through its committees.  The Board's role in risk oversight has not affected its leadership structure.
>
> The Audit Committee is specifically tasked with overseeing our compliance with legal and regulatory requirements, discussing our risk assessment and risk management processes with management and receiving information on material legal and regulatory affairs, including litigation.  Our head of internal audit, who reports directly to the committee, coordinates our global risk assessment process.  We use this process to identify, assess and prioritize internal and external risks, to develop processes for responding to, mitigating and

monitoring risks and to inform the development of our internal audit plan, our annual operating plan and our long-term strategic plan.  The committee receives detailed reports regarding our enterprise risk assessment process and the committee's meeting agendas include discussions of individual risk areas throughout the year.  Members of our management who have responsibility for designing and implementing our risk management processes regularly meet with the committee.  The committee discusses our major financial risk exposures with our CFO and Chief Accounting Officer.  The committee also receives reports from our General Counsel, Chief Information officers and other persons who are involved in our risk management processes.

The full Board considers specific risk topics, including risk-related issues pertaining to laws and regulations enforced by the U.S. Food and Drug Administration and foreign government regulators and risk associated with our strategic plan and our capital structure.  In addition, the board receives detailed regular reports from members of our executive operating committee and other personnel that include discussions of the risks and exposures involved with their respective areas of responsibility.  Further, the Board is routinely informed of developments that could affect our risk profit or other aspects of our business.

129.    The Audit Committee charter also described the Audit Committees' duties

when directors or executive officers have transactions with ZBH.  In such case, the charter

admits, the "Audit Committee must review and approve all related person transactions in

which any executive officer, director, director nominee or more than 5% stockholder has a

direct or indirect material interest" and "The Audit Committee may not approve a related

person transaction unless (1) it is in or not inconsistent with our best interest; and (2) where

applicable, the terms of such transaction are at least as favorable to us as could be obtained

from an unrelated third party."

130.    In addition, among the Audit Committee's "principal functions" as described in the 2016 proxy statement as ". . . overseeing our compliance with legal and regulatory matters and aspects of our risk management processes."

131.    The remaining ZBH Directors, Michaelson, and Rhodes, are associated with the Insider Selling Defendants parent companies and are thus interested and not independent because Insider Selling Defendants realized unlawful insider selling proceeds of hundreds of millions of dollars from their misuse of inside Company information during the relevant time period.

132.    All the Director Defendants failed to ensure that Insider Selling Defendants complied with the law with respect to their insider sales.  Thus, a majority of the Board is unable disinterestedly and independently to investigate the Claims asserted herein.

133.    In light of the foregoing facts, a majority of the Director Defendants face a substantial likelihood of liability in this case, thus rendering demand on them futile.

134.    As detailed herein, each of the Director Defendants who signed the materially false and misleading Offering Materials face a substantial likelihood of liability in this and the stockholders' class action.

135.    The Director Defendants' inaction in the face of these numerous red flags, of which they knew or should have known, was a breach of their duties of loyalty.

## COUNT I

### AGAINST THE INSIDER SELLING DEFENDANTS TO RESCIND THE 2014 STOCKHOLDERS AGREEMENT AND FOR RECISSORY DAMAGES UNDER SECTION 29(b) OF THE EXCHANGE ACT

136.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as through fully set forth herein.

137.   In connection with the Merger, the Private Equity Funds entered into a Stockholders Agreement that, *inter alia,* entitled the Private Equity Defendants to designate two members of ZBH's Board.  Pursuant to the Stockholders Agreement, the Private Equity Funds exercised their power under the Stockholders Agreement and designated Defendants Michelson and Rhodes to the Board of Directors.[17]

138.   The Insider Selling Defendants were parties to the Stockholders Agreement, which was described in the 2016 proxy statement as:

> In connection with our entry into the merger agreement related to our acquisition of Biomet, we entered into a stockholder agreement dated as of April 24, 2014 and amended as of March 30, 2015 with LVB Holding and the Sponsor Funds.  The Sponsor Funds are affiliates of The Blackstone Group, L.P. ("Blackstone"), Goldman Sachs & Co. ("Goldman Sachs"), KKR & Co., L.P. ("KKR") and TPG Global, LLC ("TPG").  The stockholders agreement became effective as of the closing date of the merger, June 24, 2015, and sets forth certain governance arrangements and contains various provisions relating to, among other things, representation on our Board, the acquisition of additional equity interests in us, prohibitions on taking certain actions relating to our company, transfer restrictions, voting arrangements and registration rights.
>
> The directors designated by the Principal Stockholder investors are granted certain information and access right to information related to the management, operations and

---

[17]   The rights of the Private Equity Funds to designate directors pursuant to the Stockholders Agreement terminated on June 16, 2016, the closing date of the June 2016 Offering, due to the Private Equity Funds beneficially owning at that time less than 30% of the shares of ZBH common stock acquired by the Private Equity Funds as consideration in the Merger.  As a result, the Stockholders Agreement required the Private Equity Funds to cause their designated directors, Michelson and Rhodes, to immediately resign from the Board of Directors unless otherwise consented to by a majority of the other directors.  However, ZBH temporarily waived such obligation to allow the Board the opportunity to further discuss its future composition and, following such discussions, the other directors unanimously consented on July 15, 2016, to Michelson and Rhodes continuing to serve as directors of ZBH.  Consequently, the Private Equity Defendants were not obligated to cause Michelson and Rhodes to resign from the Board of Directors.

> finances of us and our subsidiaries, as and when provided to
> our non-management directors. The Principal Stockholder
> investors are obligated to keep confidential certain
> information of ours, subject to certain exceptions, including
> the ability to share confidential information with the Sponsor
> Funds.

139.   Section 1.6 of the Stockholders Agreement provided for "Information Rights." Specifically, that provision granted the Private Equity Designated Directors certain information and access rights, including, to information related to the management, operations and finances of ZBH and its subsidiaries, as and when provided to the non-management directors. Under the Stockholders Agreement, the Private Equity Designated Defendants were obligated to keep confidential certain ZBH information, subject to certain exceptions, including the ability to share confidential information with the Private Equity Funds and its affiliates.[18]

140.   Importantly, the Stockholders Agreement provided the directors designated by the Private Equity Funds) with unfettered insight into all the material provided to the Board, including all materials provided to each Board committee, and the right to attend all committee meetings. Specifically, the Stockholders Agreement provided:

> ... [T]he Company and its Subsidiaries will give notice of each
> meeting of any committee of the Board (at the same time
> such notice is provided to any committee member) to
> [Private Equity Designated Directors], *provide all
> information provided to members of each such committee
> simultaneously to [Private Equity Designated Directors] and
> permit the [Private Equity Designated Directors] to attend all
> such committee meetings as an observer.*

---

[18]   The Stockholders Agreement contained a number of other provisions that applied during 2016 until the Stockholders Agreement automatically terminated on August 12, 2016, the closing date of the August 2016 Offering and the date on which the Private Equity Funds no longer owned ZBH common stock. This included the provision providing the ability to share confidential information with the Private Equity Defendants and their affiliates.

141.   The Stockholders Agreement also provided in relevant part:

ARTICLE IV

REGISTRATION

4.1     <u>Demand Registrations</u>.

(a)  … Demand Stockholders ("<u>Requesting Stockholders</u>") shall be entitled to make unlimited written request of the Company (each, a "Demand") for registration under the Securities Act of an amount of Registrable Securities then held by such Requesting Stockholders that equals or is greater than the Registrable Amount (a "<u>Demand Registration</u>"); provided that the Demand Stockholders shall not make an aggregate of more than four (4) Demands in any single calendar year.  Thereupon the Company will, subject to the terms of this Agreement, use its reasonable best efforts to effect the registration as promptly as reasonably practicable under the Securities Act of:

(i)  the Registrable Securities which the Company has been so requested to register by the Requesting Stockholders for disposition in accordance with the intended method of disposition stated in such Demand;

all to the extent necessary to permit the disposition (in accordance with the intended methods thereof) of the Registrable Securities and the additional shares of Company Common Stock, if any, to be so registered.

* * *

(d)  Demand Registrations shall be on such appropriate registration form of the Commission as shall be selected by the Company and reasonably acceptable to the Requesting Stockholders.

4.9     <u>Registration Indemnification</u>.

(a)      The Company agrees, without limitation as to time, to indemnify and hold harmless, to the fullest extent permitted by Applicable Law, each Selling Stockholder and its Affiliates and their respective officers, directors, members, shareholders, employees, managers, partners, accountants, attorneys and agents and each Person who controls (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act) such Selling Stockholder or such other indemnified Person and the officers, directors, members, shareholders, employees, managers, partners, accountants, attorneys and agents of each such controlling Person, each underwriter (including, for the avoidance of doubt, any Selling Stockholder that is deemed to be acting as an underwriter under Applicable Law), if any, an each Person who controls (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act) such underwriter , from and against all losses, claims, damages, liabilities, costs, expenses (including reasonable and documented expenses of investigation and reasonable and documented attorneys' fees and expenses), judgments, fines, penalties, charges and amounts paid in settlement (collectively, the "Losses"), as incurred, arising out of, caused by, resulting from or relating to any untrue statement (or alleged untrue statement) of a material fact contained in any registration statement, prospectus or preliminary prospectus or Free Writing Prospectus or any amendment or supplement thereto or any omission (or alleged omission) of a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading and (without limitation of the preceding portions of this Section 4.9(a)) will reimburse each such Selling Stockholder, each of its Affiliates, and each of their respective officers, directors, members, shareholders, employees, managers, partners, accountants, attorneys and agents and each such Person who controls each such Selling Stockholder and officers, directors, members, shareholders, employees, managers, partners, accountants, attorneys and agents of each such controlling Person, each such underwriter and each such Person investigating and defending or settling any such claim, Loss, damage, liability or action, excepts, in each of the cases described in this Section 4.9(a), insofar as the same are caused by any information furnished in writing to the Company by any other party expressly for use therein.

142.     Exchange Act Section 29(b), 15 U.S.C. § 78cc(b), provides in pertinent part as follows:

> Every contract made in violation of any provision of this
> chapter or of any rule or regulation thereunder and every
> contract ... heretofore on hereafter made the performance of
> which involves the violation of, or the continuance of any
> relationship or practice in violation of any provision of this
> chapter or any rules or regulation thereunder, shall be void ...
> as regards the rights of any person who in violation of any
> such provision, rule or regulation shall have made or engaged
> in the performances of contract.

143.     According to the United States Supreme Court in *Mills v. Electric Auto-Lite*, 356 U.S. 375, 386-87 (1970), the principle that corporate contracts can be avoided under Section 29 of the Exchange Act is well-established (footnotes omitted):

> This language establishes that the guilty party is precluded
> from enforcing the contract against an unwilling innocent
> party.

144.     The Stockholders Agreements permitted the Insider Seller Defendants to violate the provisions of the Exchange Act and were thus inherently violative of the federal securities laws.

145.     As a result of the foregoing ZBH is entitled to recission of the Stockholders Agreements and contracts and/or return of all monies and benefits previously paid thereunder.

## COUNT II

**AGAINST DEFENDANTS BEGLEY, BERNARD, BISARO, BOUDREAUX, COLLINS, DVORAK, FARRELL, FLORIN, GLASSCOCK, HAGEMANN, HIGGINS, MARSHALL, JR., MICHELSON, PICKETT, COLLINS, AND RHODES, FOR CONTRIBUTION UNDER 21D(5)(A)-(D) AND FOR VIOLATIONS OF SECTIONS 10(b) AND 21D OF THE EXCHANGE ACT**

146.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

147.    Defendants named in this Count are named as defendants in related securities class actions.  The conduct of these Defendants, as described herein, has exposed the Company to significant liability under various federal securities laws by their disloyal acts.

148.    ZBH is named as a Defendant in related securities class actions that allege and assert claims arising under section 10(b) of the Exchange Act.  The Company is alleged to be liable to private persons, entities, and/or classes by virtue of many of the same facts alleged herein.  If ZBH is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omission of all or some of the Defendants as alleged herein, who have caused the Company to suffer substantial harm through their disloyal acts.  The Company is entitled to contribution and indemnification from these Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

149.    As officers, directors, and otherwise, Defendants had the power to ability to, and did, control over influence, either directly or indirectly, ZBH's general affairs, including the content of its public statements, and has the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated section 10(b) of the Exchange Act and SEC Rule 10b-5.

150.    Defendants Christopher B. Begley, Betsy J. Bernard, Paul M. Bisaro, Gail K. Boudreaux, Tony W. Collins, David C. Dvorak, Michael J. Farrell, Daniel P. Florin, Larry Glasscock, Robert A. Hagemann, Arthur J. Higgins, Robert J. Marshall, Jr., Michael W. Michelson, Cecil B. Pickett, and Jeffrey K. Rhodes are liable under Section 21D of the

Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

151.    Defendants Christopher B. Begley, Betsy J. Bernard, Paul M. Bisaro, Gail K. Boudreaux, Tony W. Collins, David C. Dvorak, Michael J. Farrell, Daniel P. Florin, Larry Glasscock, Robert A. Hagemann, Arthur J. Higgins, Robert J. Marshall, Jr., Michael W. Michelson, Cecil B. Pickett, Jeffrey K. Rhodes have damaged the Company and are liable to the Company for contribution and/or indemnification.

152.    No adequate remedy at law exists for Plaintiff by and on behalf of the Company.

## COUNT III

### AGAINST THE OFFICER DEFENDANTS TO RESCIND THEIR EMPLOYMENT CONTRACT COMPENSATION UNDER SECTION 29(B) OF THE EXCHANGE ACT

153.    Plaintiff incorporates by reference and realleges each and every preceding allegation set forth above, as though fully set forth herein.

154.    Exchange Act Section 29(b), 15 U.S.C. § 78cc(b), provides in pertinent part as follows:

> Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder and every contract ... heretofore on hereafter made the performance of which involves the violation of, or the continuance of any relationship or practice in violation of any provision of this chapter or any rules or regulation thereunder, shall be void ... as regards the rights of any person who in violation of any such provision, rule or regulation shall have made or engaged in the performances of contract.

155.    According to the United States Supreme Court in *Mills v. Electric Auto-Lite*, 356 U.S. 375, 386-87 (1970), the principle that corporate contracts can be avoided under the securities laws is well-established (footnotes omitted):

> This language establishes that the guilty party is precluded from enforcing the contract against an unwilling innocent party.

156.    Section 29(b) of the Exchange Act provides equitable remedies that include, among other things, provisions allowing for the voiding of contracts where the performance of the contract involved violation of any provision of the Exchange Act.

157.    The Director Defendants violated the federal securities laws while performing their duties under various agreements they had with ZBH for director services, and ZBH is entitled to rescission of those agreements.

158.    ZBH was and is an innocent party with respect to Officer Defendants' Exchange Act violations.

159.    The Officer Defendants compensation in 2015, 2016 and 2017 included performance related components such as "Annual Cash Incentive Plan;" and "Biomet Merger Cash Integration Incentive Plan."

160.    In the 2016 proxy statement, ZBH explained its rationale for the executive officer compensation awards:

> Synergy targets for the post-closing period of July 1, 2015 – December 21, 2015 were exceeded and growth and transformation milestones were fully achieved.

161.    ZBH cited six "2015 Achievements and Value Creation" as factors in the compensation committee's decisions on compensation for the Officer Defendants:

> (a)    Net sales for the year were $6.0 billion, an increase of 28.3% over 2014;

> (b)    Diluted earnings per share ("EPS") for 2015 were $6.90 on an adjusted basis, an increase of 7.8% over 2014;

(c)     In the second half, we over delivered against our
        initial net synergy targets;

(d)     During the Fourth Quarter, we substantially
        completed integration of the Zimmer and Biomet
        global commercial organization;

(e)     Our total shareholder return ("TSR") for the three
        year period end December 31, 2015 was 15.49%; and

(f)     We focused significant resources on our quality and
        operational excellence initiatives, investments
        intended to achieve excellence in our global quality
        infra.

162.    In 2016 executives were also given "Special One-Time Awards in

Connection with the Biomet Merger."

163.    For 2015 Defendant Dvorak's total compensation was $11,392,178.00.

Defendant Flom's 2015 total compensation was $5,514,954.00.

164.    Similarly for 2016, ZBH noted "improvements in sales," "operating profit,"

"operating cash flow," "EPS," "strategic investments," "Quarterly and Operational

Excellence" and "Net Operating Synergies" from the June 2015 merger as factors for the

compensation award under contracts whose rescission is sought herein.

165.    In 2016 Defendant Dvorak was paid total compensation of $11,492,363.00.

Defendant Florin's total acquisition was $3,293,400.00 in 2016.

166.    In 2017 Defendant Dvorak paid $8,777,220.00 for his half year of

employment in 2017, until he was replaced by Florian in July 2017.  Defendant Florin

earned $4,886,341.00 in 2017.

167.    Defendant Collins was a high ranking executive officer of ZBH in 2015,

2016, 2017 but his compensation was not disclosed.

168.     Plaintiffs, on behalf of ZBH, seek rescission of the contracts between the

Director Defendants and ZBH due to these defendants' violations of the Exchange Act

while performing their job duties.

169.     As a result of the foregoing, ZBH is entitled to recission of those agreements

and contracts and/or return of all monies and benefits previously paid thereunder.

## COUNT IV

### AGAINST THE DIRECTOR DEFENDANTS TO RESCIND THEIR COMPENSATION UNDER SECTION 29(B) OF THE EXCHANGE ACT

170.     Plaintiff incorporates by reference and realleges each and every preceding

allegation set forth above, as though fully set forth herein.

171.     Exchange Act Section 29(b), 15 U.S.C. § 78cc(b), provides in pertinent part

as follows:

> Every contract made in violation of any provision of this
> chapter or of any rule or regulation thereunder and every
> contract ... heretofore on hereafter made the performance of
> which involves the violation of, or the continuance of any
> relationship or practice in violation of any provision of this
> chapter or any rules or regulation thereunder, shall be void ...
> as regards the rights of any person who in violation of any
> such provision, rule or regulation shall have made or engaged
> in the performances of contract.

172.     According to the United States Supreme Court in *Mills v. Electric Auto-Lite*,

356 U.S. 375, 386-87 (1970), the principle that corporate contracts can be avoided under

the securities laws is well-established (footnotes omitted):

> This language establishes that the guilty party is precluded
> from enforcing the contract against an unwilling innocent
> party.

173.    Section 29(b) of the Exchange Act provides equitable remedies that include, among other things, provisions allowing for the voiding of contracts where the performance of the contract involved violation of any provision of the Exchange Act.

174.    The Director Defendants violated  the securities laws while performing their duties under various agreements they had with ZBH for director services, and ZBH is entitled to rescission of those agreements.

175.    ZBH was and is an innocent party with respect to Director Defendants' Exchange Act violations.

176.    In the relevant period, the Director Defendants were paid the following compensation:

|           | 2015 | 2015 | 2017 |
|-----------|------|------|------|
| Begley    | $283,688.00 | $287,859.00 | $292,553.00 |
| Bernard   | $296,670.00 | $300,786.00 | $307,112.00 |
| Bisaro    | $281,362.00 | $284,902.00 | $  48,933.00 |
| Boudreaux | $283,317.00 | $287,459.00 | $292,142.00 |
| Farrell   | $280,654.00 | $284,591.00 | $289,190.00 |
| Glasscock | $446,629.00 | $450,894.00 | $455,147.00 |
| Hagemann  | $302,289.00 | $307,619.00 | $316,648.00 |
| Higgins   | $306,288.00 | $311,925.00 | $318,598.00 |
| Michelson | $  71,353.00 | $283,730.00 | $288,304.00 |
| Pickett   | $297,274.00 | $301,202.00 | $306,543.00 |
| Rhodes    | $  71,302.00 | $283,295.00 | $287,436.00 |

177.    Plaintiffs, on behalf of ZBH, seek rescission of the contracts between the Director Defendants and ZBH due to these defendants' violations of the Exchange Act while performing their job duties.

178.    As a result of the foregoing ZBH is entitled to rescission of those agreements and contracts and/or return of all monies and benefits previously paid thereunder.

## RELIEF REQUESTED

WHEREFORE, Plaintiff demands judgment as follows:

A.    Determining that this action is a proper derivative action maintainable under law and demand is excused;

B.    Awarding, against all Director and Officer Defendants and in favor of ZBH, the return of contractual benefits to ZBH;

C.    Awarding to ZBH as rescissory damages under Section 29(b) disgorgement from the Insider Selling Defendants, and from its affiliates, and ordering disgorgement of all profits, benefits and other compensation obtained by their insider trading and further profits flowing therefrom;

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: October 2, 2019

                                        **COOCH AND TAYLOR, P.A.**

                                        */s/ Blake A. Bennett*
                                        Blake A. Bennett (#5133)
                                        The Nemours Building
                                        1007 N. Orange Street, Suite 1120
                                        Wilmington, Delaware 19801
                                        (302) 984-3800
                                        *Attorney for Plaintiff*

**OF COUNSEL**
**GARDY & NOTIS, LLP**
Mark C. Gardy
James S. Notis
Meagan A. Farmer
126 East 56th Street, 8th Floor
New York, New York 10022
(212) 905 0509

*Attorneys for Plaintiffs*