# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE ZIMMER BIOMET HOLDINGS, INC. FEDERAL DERIVATIVE LITIGATION | No.: 1:19-cv-1855-LPS<br><br>**AMENDED VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Lead Plaintiffs Alex DiGaudio and Howard Karp ("Plaintiffs"), derivatively, on behalf of Zimmer Biomet Holdings, Inc. ("ZBH" or the "Company"), alleges the following based on knowledge as to Plaintiffs and Plaintiffs' conduct and upon information and belief as to all other matters and based on the investigation conducted by Plaintiffs' counsel, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by ZBH, FDA notices and letters to ZBH concerning ZBH's major manufacturing facilities, securities analyst reports, press releases, media reports, and other public statements issued by, or about, the Company and the files in the actions entitled *Barney v. Zimmer Biomet Holdings, Inc.*, 3:17-cv-00616-JD-MGG (N.D. Ind.), *Martin v. Zimmer Biomet Inc., et al.*, 3:17-cv-00615-JD-MGG (N.D. Ind.), *Shah v. Zimmer Biomet Holdings, Inc.*, 3:16-cv-00815 (N.D. Ind.) and *Green v. Begley*, C.A. No. 2019-0455 (Del. Ch.). The claims in Count I to IV are not duplicative of any claims asserted in the Chancery Court actions. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

# I.

## INTRODUCTION

1.      This is a stockholder derivative action brought on behalf of ZBH seeking to pursue remedies for violations of the federal securities laws by officers and/or directors of ZBH and persons and entities who were contractual counterparties with ZBH.  Applicable securities laws allow ZBH to rescind the contracts with those counterparties and/or seek recissory damages if recission impractical.

2.      The claims against the Company's current and former officers and directors arise are under Section 29(b) and 21(D) of the Securities Exchange Act of 1934 (the "Exchange Act"). In addition to being subject to those provisions of the Exchange Act, these officer and director defendants also had a fiduciary duty to act in the Company's best interests, and to actively oversee the Company's operations and financial reporting to identify and prevent unlawful conduct, yet exposed ZBH to substantial liability by knowingly or recklessly permitting the Company and its employees to issue materially false and misleading financial statements and press releases.

3.      Plaintiffs also seek to recover, on behalf of ZBH, under Section 29(b) of the Exchange Act to void the Stockholders' Agreement and seek recovery of the insider trading profits earned by the Insider Selling Defendants and their respective affiliates in 2016, as a form of rescissory damages and for reimbursement of registration expenses ZBH paid for the June 2016 Offering and the August 2016 Offering, and for rescission of any contractual indemnification owed to counterparties (*i.e.*, Insider Seller Defendants) under an April 24, 2014 Stockholders Agreement (the "Stockholders Agreement").

4.     ZBH was the product of a $13.4 billion mega-merger between competitors Zimmer Holdings, Inc. ("Legacy Zimmer") and Biomet, Inc. ("Legacy Biomet") that closed in June of 2015 (the "Merger").  Both companies were major medical device manufacturers headquartered in Warsaw, Indiana.  To effectuate the Merger, Legacy Zimmer (a publicly traded company) acquired LVB Acquisition, Inc. ("LVB") (a private company), which owned Legacy Biomet.  The combined entities and their subsidiaries became ZBH, headquartered in Warsaw, and publicly traded on the New York Stock Exchange (the "NYSE").  ZBH operates in more than 100 countries and now has approximately 18,500 employees.

5.     LVB, prior to the Merger, had been owned by approximately twenty-five private equity funds (the "Private Equity Funds") affiliated with four of the largest private equity firms in the world: (i) Kohlberg Kravis Roberts & Co L.P. ("KKR"); (ii) The Blackstone Group L.P. ("Blackstone"); (iii) TPG Global, LLC ("TPG"); and (iv) Goldman Sachs Capital Partners ("GS Capital Partners").  In the Merger, those funds received stock constituting approximately 15% of the equity of the Company and, pursuant to the Stockholders Agreement, received certain registration rights and the right to designate two members of ZBH's board of directors (the "Board") who were contractually permitted to share confidential information (related to ZBH's management, operations and finances) with those funds.  The two designee directors were designated by parent companies KKR and TPG.

6.     ZBH purported to develop and market products of the highest quality that were both safe and effective.  By early 2016, ZBH recognized that the growth story it was touting to investors after the Merger in 2015 was not attainable due to "systemic" quality control issues identified by internal audits that directly affected Legacy Biomet's primary manufacturing facility responsible for supplying its most important products.  The officers and directors of ZBH

– the overwhelming majority of whom were experienced pharmaceutical industry executives – also knew an FDA inspection of that facility was imminent and that ongoing FDA scrutiny of ZBH's other facilities further heightened the Company's internal concerns.  The quality issues warranted major remediation of the Legacy Biomet facility, which could only be done if the facility were shut down thus causing production losses that would materially adversely impact ZBH revenue and earnings.

7.      Defendants not only failed to address these issues but had to have been aware of the internal audits and FDA scrutiny and chose to conceal them from the public, thereby allowing ZBH's quarterly and annual financial statements in 2016 to falsely and misleadingly conceal the problems, risks and potential losses.

8.      The director and officer defendants had a duty to ensure that ZBH's financial statements and reports were true, accurate, complete, and not misleading.  These defendants have known since 2015, if not sooner, that ZBH's North Campus was at risk and that the failure to disclose these known and actual conditions and risk rendered ZBH's public financial statements misleading and artificially inflated the price of ZBH securities.  The officer defendants named herein earned their contractual benefits in part at least through the performance of services and conduct which violated federal securities laws.  Similarly, the director defendants, who had understandings and agreements with ZBH to provide faithful, lawful director services also earned these benefits and compensation through services which involved violations of federal securities laws.

9.      The officer defendants had employment contracts with ZBH which entitled them to compensation and benefits during their tenure based upon revenues and income of ZBH. These contracts provided the director and officer defendants with powerful incentive to postpone

capital improvements, maintenance and other work at its manufacturing facilities which was required under government mandated manufacturing standards in order to avoid costly shutdowns or reductions in manufacturing capacity and output.

10.     The Insider Selling Defendants were the beneficiaries of and counter parties to the Stockholders Agreement, which was a contract between Insider Selling Defendants and/or their entity parents which, *inter alia*, allowed Insider Seller Defendants to demand registration of the equity they received in the Merger so they could sell their stock illegal insider trading log these defendants and into the public markets.  Under the Stockholders Agreement, Insider Selling Defendants could receive inside confidential information from ZBH and use it to time the sales of their equity holdings.  Accordingly, the Stockholders Agreement thus allowed and facilitated performance of the Stockholders Agreement by Insider Selling Defendants constituted violations of federal securities laws the Stockholders Agreements were therefore inherently violative of the federal securities laws.

11.     The Insider Selling Defendants (the private equity fund affiliates of Defendants TPG and KKR) misused material nonpublic information and sold over $2.25 billion of ZBH stock during the three months before the FDA commenced an inspection of major manufacturing facilities at ZBH.  The FDA inspection of the Legacy Biomet facility eventually forced ZBH to finally disclose the manufacturing facility deficiency issues because ZBH would soon be forced to close its flagship North Campus production facilities.  The risks and conditions concealed by the director and officer defendants concerning the quality issues at Legacy Biomet's North Campus facilities materialized as the extensive remediation resulted in substantial disruptions to operations and caused severe supply shortages, all of which negatively impacted ZBH revenues.

12.     When ZBH publicly disclosed "supply shortages" and lowered growth, and the market learned about the quality issues at the Legacy Biomet facility, it caused ZBH's share price to plummet and wiped out billions of dollars in stockholder value.  The Insider Selling Defendants, of course, avoided these losses by selling their stock in June and August 2018 before such disclosures.

13.     Prior to public disclosure of the FDA issues, conditions and events, the Insider Selling Defendants sold their remaining holdings of ZBH common stock in two underwritten public offerings, which represented approximately 9.43% of ZBH's common stock outstanding.[1] In the offering of ZBH common stock for sale by Insider Defendants only on June 13, 2016 ("June 2016 Offering"), the Insider Selling Defendants unloaded approximately $1.3 billion of their stock to the public and almost another $1 billion shortly thereafter in the offering of ZBH stock for sale by Insider Defendants only on August 9, 2016, ("August 2016 Offering").  The director and officer defendants permitted and assisted the Insider Selling Defendants to sell their stock by registering the shares for sale and allowing materially misleading quarterly and annual financial reports to be incorporated into registration statements and prospectuses issued for each offering.

## II.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under the laws of the United States and the State of Delaware.  This Court has jurisdiction over the subject matter of this action under its federal

---

[1]     Seven funds affiliated with Blackstone sold their remaining shares of ZBH common stock in a $1 billion public offering in February 2016.  The funds affiliated with GS Capital Partners also participated in the February 2016 offering but only sold approximately half of their ZBH holdings in that offering.

question jurisdiction pursuant to 28 U.S.C. § 1331.  This Court has exclusive jurisdiction

pursuant to Section 27 of the Exchange Act, 5 U.S.C. § 78(aa), because this action asserts claims

under Section 29(b) of the Exchange Act, 15 U.S.C. § 78(n)(a).

15.     Jurisdiction is proper under Federal Rule of Civil Procedure 23.1 because

Plaintiffs are and have been continuously stockholders of ZBH at the time of the transactions

described herein and the action is not one in which collusion is alleged for jurisdictional

purposes.  As alleged herein, demand is excused as futile.

16.     Venue is proper in this District under 28 U.S.C. § 1391(a) because the Company's

by-laws in effect as of the time of the commencement of this litigation includes a provision

designating the state and federal courts located within the State of Delaware as the sole and

exclusive forum for Plaintiffs to bring derivative litigation on behalf of the Company.

17.     Defendants directly or indirectly used the mails and means and instrumentalities

of interstate commerce in connection with the acts, practices and courses of businesses alleged

herein.

### III.

### THE PARTIES

#### A.     Plaintiffs

18.     Plaintiffs are and have been continuous beneficial owners of ZBH and Legacy

Zimmer since it was spun off from Bristol Myers Squibb, Inc. in 2001.  Plaintiffs will fairly and

adequately represent the interests of the stockholders who are similarly situated in enforcing the

right of the corporation.  The action is not a collusive one to confer jurisdiction that the Court

would otherwise lack.

**B.     Nominal Corporate Defendant**

19.     Defendant ZBH is a Delaware corporation headquartered in Warsaw, Indiana.

**C.     Officer Defendants**

20.     Defendant David C. Dvorak ("Dvorak") was, at all relevant times, CEO, President, and a director of ZBH.  Dvorak was also a member of the Integration Steering Committee ("ISC") in connection with the Merger.  He is herein sued in herein both in his capacity as an officer and as a director.  Dvorak signed or authorized the signing of the Company's materially false and misleading registration statements in connection with the June 2016 Offering and the August 2016 Offering.  Dvorak previously served in various capacities as Legacy Zimmer's Group President, Global Businesses, Chief Legal Officer, Executive Vice President, Corporate Services, Chief Counsel and Secretary, Chief Compliance Officer, and SVP, Corporate Affairs and General Counsel.  Before, Dvorak served as Senior Vice President, General Counsel and Corporate Secretary of STERIS Corporation.  Dvorak formerly practiced corporate law, focusing on mergers and acquisitions and on securities law.  Dvorak had ultimate authority, subject to board approval to make the decisions and give the orders to ensure ZBH's manufacturing facilities met all applicable regulatory standards and remained in compliance with all regulations.

21.     Defendant Daniel P. Florin ("Florin") was, at all relevant times, SVP and CFO of ZBH.  Florin was also a member of the ISC in connection with the Merger.  Florin signed or authorized the signing of the Company's materially false and misleading registration statements for the June 2016 Offering and the August 2016 Offering, as well as ZBH's Quarterly Reports on Forms 10-Q for ZBH's first and second calendar quarters in 2016.  Florin served as SVP and CFO of Legacy Biomet from June 2007 to June 2015.

22.     Defendant Tony W. Collins ("Collins") was, at all relevant times, Vice President, Corporate Controller and Chief Accounting Officer (Principal Accounting Officer) of ZBH. Collins also signed or authorized the signing of the materially false and misleading registration statements and ZBH's Quarterly Reports on Form 10-Q for ZBH's first and second calendar quarters in 2016. Collins joined Legacy Zimmer in 2010 as Vice President, Finance for the Global Reconstructive Division and U.S. Commercial organization.

23.     Defendants Dvorak (in addition to his power and responsibility with respect to manufacturing and production issues described above), Florin, and Collins (collectively the "Officer Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Zimmer's reports to the SEC, and the offering materials used to sell the Insider Selling Defendants' ZBH shares in 2016, press releases, and presentations to securities analysts, investment managers, and institutional investors, *i.e.,* the market. The Officer Defendants were provided with copies of ZBH's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, the Officer Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false *and/or* misleading.

### D.     Director Defendants

24.     Defendant Harry Glasscock ("Glasscock") was, at all relevant times, Chairman of ZBH's Board and a member of the Audit Committee. Defendant Glasscock signed or authorized the signing of ZBH's materially false and misleading registration statements filed

with the SEC, which permitted and facilitated the sales by the Insider Selling Defendants, pursuant to the terms of the Stockholders Agreement. Glasscock was Chairman of WellPoint, Inc. from 2005 until 2010 and President and CEO of WellPoint, Inc. from 2004 to 2007. Glasscock served as President and CEO of Anthem, Inc. from 2001 to 2004, and Chairman from 2003 to 2004.

25.     Defendant Christopher B. Begley ("Begley") was, at all relevant times, a director of ZBH, a member of the Audit Committee, and signed or authorized the signing of ZBH's materially false and misleading registration statements, which permitted and facilitated the sales by Insider Selling Defendants, pursuant to the terms of the Stockholders Agreement. Begley was Executive Chairman of the Board of Hospira, Inc. from May 2007 until January 2012, and CEO from 2004 to March 2011. Begley served in various positions with Abbott Laboratories between 1986 and 2004, most recently as SVP of Abbott's Hospital Products division.

26.     Defendant Betsy J. Bernard ("Bernard") was, at all relevant times, a director of ZBH, and signed or authorized the signing of ZBH's materially false and misleading registration statements, which permitted and facilitated the sales by Insider Selling Defendants, pursuant to the terms of the Stockholders Agreement.

27.     Defendant-Paul M. Bisaro ("Bisaro") was, at all relevant times, a director of ZBH, and signed or authorized the signing of ZBH's materially false and misleading registration statements, which permitted and facilitated the sales by the Insider Selling Defendants, pursuant to the terms of the Stockholders Agreement. Bisaro has been Executive Chairman of Allergan pic (formerly Actavis plc) since July 2014. Bisaro served in various roles as Chairman, President, CEO, and director of Actavis between 2007 and 2014. Bisaro served as President,

Chief Operating Officer and a member of the board of directors of Barr Pharmaceuticals, Inc. from 1999 to 2007, and General Counsel from 1992 to 1999.

28.     Defendant Gail K. Boudreaux ("Boudreaux") was, at all relevant times, a director of ZBH, member of the Audit Committee, and signed or authorized the signing of ZBH's materially false and misleading registration statements, which permitted and facilitated the sales by the Insider Selling Defendants, pursuant to the terms of the Stockholders Agreement. Boudreaux has been CEO and Founder at GKB Global Health, LLC since 2015.  Boudreaux served as CFO of UnitedHealthcare from 2011 to 2014 and Executive Vice President of UnitedHealth Group from 2008 to 2015.  From 2005 to 2008, Boudreaux served as Executive Vice President, External Operations for Health Care Services Corporation, and prior to that served as President of Blue Cross and Blue Shield of Illinois.  Before joining HCSC, Boudreaux held various positions at Aetna.

29.     Defendant Michael J. Farrell ("Farrell") was, at all relevant times, a director of ZBH, and signed or authorized the signing of ZBH's materially false and misleading registration statements, which permitted and facilitated the sales by the Insider Selling Defendants, pursuant to the terms of the Stockholders Agreement.  Farrell has been CEO of ResMed Inc. since 2013, and was President since 2011.  Farrell was SVP of the global business unit for sleep apnea therapeutic and diagnostic devices from 2007 to 2011, and before that held various senior roles in marketing and business development. Before joining ResMed in September 2000, Farrell worked in management consulting, biotechnology, chemicals and metals manufacturing at Arthur D. Little, Genzyme Corporation, The Dow Chemical Company, and BHP Billiton.

30.     Defendant Robert A. Hagemann ("Hagemann") was, at all relevant times, a director of ZBH, a member of the Audit Committee, and signed or authorized the signing of

ZBH's materially false and misleading registration statements, which permitted and facilitated the sales by the Insider Selling Defendants, pursuant to the terms of the Stockholders Agreement.

31.    Defendant Arthur J. Higgins ("Higgins") was, at all relevant times, a director of ZBH, and signed or authorized the signing of ZBH's materially false and misleading registration statements, which permitted and facilitated the sales by the Insider Selling Defendants, pursuant to the terms of the Stockholders Agreement.  Higgins has been Consultant with the Blackstone Group since 2010 and had served as Chairman of the Board of Management of Bayer HealthCare AG from 2006 to 2010 and Chairman of the Bayer HealthCare Executive Committee from 2004 to 2010.  Prior to joining Bayer HealthCare, Higgins served as Chairman, President and CEO of Enzon Pharmaceuticals, Inc, after spending fourteen years with Abbott Laboratories, most recently as President of the Pharmaceutical Products Division from 1998 to 2001.

32.    Defendant Michael W. Michelson ("Michelson") was, at all relevant times, until his departure in mid-2016, a director of ZBH.  He resigned in 2016 upon sale of KKR's stake in ZBH.  He signed or authorized the signing of ZBH's materially false and misleading registration statements, which permitted and facilitated sales by the Insider Selling Defendants, pursuant to the terms of the Stockholders Agreement.  Michelson has been a Member of KKR Management LLC, a private equity investment manager and the general partner of KKR, since October 2009, and has worked for various KKR entities since 1981.  Michelson worked at Latham &Watkins, where he was involved in a broad corporate practice while specializing in management buyouts.  Michelson was a director of Legacy Biomet prior to the Merger. Michelson was designated for nomination to ZBH's Board by the Private Equity Funds.

12

33.     Defendant Cecil B. Pickett ("Pickett") was, at all relevant times, a director of ZBH, and signed or authorized the signing of ZBH's materially false and misleading registration statements, which permitted and facilitated the sales by the Insider Selling Defendants, pursuant to the terms of the Stockholders Agreement.  Pickett was President of Research and Development and a member of the board of directors of Biogen Idee Inc. from 2006 until 2009.  Prior to joining Biogen Idee, Pickett held several senior R&D positions, including Corporate SVP of Schering-Plough Corp. and President of Schering-Plough Research Institute, as well as, several senior R&D positions at Merck & Co.

34.     Defendant Jeffrey K. Rhodes ("Rhodes"), was at all relevant times, a director of ZBH, and signed or authorized the signing of the ZBH's materially false and misleading registration statements filed with the SEC in 2016 to facilitate stock sales by Insider Seller Defendants, pursuant to the terms of the Stockholders Agreement.  Rhodes is a partner at TPG and a leader of the firm's investment activities in the healthcare services, pharmaceutical and medical device sectors.  Prior to joining TPG Capital, L.P. in 2005, Rhodes was with McKinsey & Company and Article27 LTD, a start-up software company.  Rhodes was a director of Legacy Biomet prior to the Merger.  Rhodes was nominated to ZBH's Board by the Private Equity Defendants.

35.     Defendants Glasscock, Begley, Bernard, Bisaro, Boudreaux, Farrell, Hagemann, Higgins, Michelson, Pickett, Dvorak, and Rhodes are herein referred to as the "Director Defendants."

36.     The Director Defendants had ultimate responsibilities for ensuring the ZBH's operations and facilities were in compliance with all applicable laws, regulations and standards so ZBH could operate efficiently, effectively, lawfully and profitably.  In order to do so ZBH

Board was required to institute reporting and monitoring systems adequate to allow the Board to receive timely information so the Board could make informed decisions on ZBH actions to safeguard and protect.

  **E.**  **Insider Selling Defendants**

  37.  Defendant KKR Biomet LLC ("KKR Biomet") was, prior to the sale of its shares in mid-2016, a major stockholder of ZBH that owned approximately 7,529,640 shares of ZBH common stock as a result of the Merger. Defendant KKR Biomet sold approximately 3,764,820 shares of stock in the June 2016 Offering for net proceeds of approximately $434 million and sold approximately 3,764,820 shares of stock in the August 2016 Offering for net proceeds of approximately $485 million. Combined, Defendant KKR Biomet received net proceeds of approximately $919 million from the offerings. Defendant KKR Biomet was identified in the registration statements and prospectuses for the June 2016 Offering and the August 2016 Offering as one of the "Selling Stockholders" offering ZBH common stock in the offerings. Defendant KKR Biomet is an affiliate of KKR.

  38.  Defendant TPG Partners IV, L.P. ("TPG Partners IV") was prior to the sales of its shares in mid-2016, a major stockholder of ZBH and owned approximately 280,938 shares of ZBH common stock as a result of the Merger. Defendant TPG Partners IV sold approximately 140,469 shares of stock in the June 2016 Offering for net proceeds of approximately $16.2 million and approximately 140,469 shares of stock in the August 2016 Offering for net proceeds of approximately $18 million. In total, Defendant TPG Partners IV received net proceeds of $34.2 million from both offerings.

  39.  Defendant TPG Partners V, L.P. ("TPG Partners V") was, prior to the sale of its shares in mid-2016, a major stockholder of ZBH and owned approximately 5,703,170 shares of

ZBH common stock as a result of the Merger.   Defendant TPG Partners V sold approximately 2,851,585 shares of stock in the June 2016 Offering for net proceeds of approximately  $328.8 million and approximately 2,851,585 shares of stock in the August 2016 Offering for net proceeds of approximately $367.8 million.   In total, Defendant TPG Partners V received net proceeds of $696.6 million in both offerings.

40.    Defendant TPG FOF V-A, L.P. ("TPG FOF V-A") was, prior to the sale of its shares in mid-2016, a major stockholder of ZBH and owned approximately 14,921 shares of ZBH common stock as a result of the Merger.   Defendant TPG FOF V-A sold approximately 7,461 shares of stock in the June 2016 Offering for net proceeds of approximately $860,000 and approximately 7,460 shares of stock in the August 2016 Offering for net proceeds of approximately $1 million.   In total, Defendant TPG FOF V-A received net proceeds of $1.8 million in both offerings.

41.    Defendant TPG FOF V-B, L.P. ("TPG FOF V-B") was, prior to the sale of its shares in mid-2016, a major stockholder of ZBH and owned approximately 12,033 shares of ZBH common stock as a result of the Merger.  Defendant TPG FOF V-B sold approximately 6,016 shares of stock in the June 2016 Offering for net proceeds of approximately $693,700 and approximately 6,017 shares of stock in the August 2016 Offering for net proceeds of approximately $776,100.  In total, Defendant TPG FOF V-A received net proceeds of $1.47 million in both offerings.

42.    Defendant TPG LVB Co-Invest LLC ("TPG LVB Co-Invest I") was, prior to the sale of its shares in mid-2016, a major stockholder of ZBH and owned approximately 1,325,152 shares of ZBH common stock as a result of the Merger.  Defendant TPG LVB Co-Invest I sold approximately 662,576 shares of stock in the June 2016 Offering for net proceeds of

approximately $76.4 million and approximately 662,576 shares of stock in the August 2016 Offering for net proceeds of approximately $85.5 million. In total, Defendant TPG LVB Co-Invest I received net proceeds of $161.9 million in both offerings.

43.     Defendant TPG LVB Co-Invest II LLC ("TPG LVB Co-Invest II") was, prior to the sale of its shares in mid-2016, a major stockholder of ZBH and owned approximately 15,496 shares of ZBH common stock as a result of the Merger. Defendant TPG LVB Co-Invest II sold approximately 7,748 shares of stock in the June 2016 Offering for net proceeds of approximately $900,000 and approximately 7,748 shares of stock in the August 2016 Offering for net proceeds of approximately $1 million. Combined, Defendant TPG LVB Co-Invest II received net proceeds of $1.9 million in both offerings.

44.     Defendants TPG Partners IV, TPG Partners V, TPG FOF V-A, TPG FOF V-B, TPG LVB Co-Invest I, and TPG LVB Co-Invest II, are herein collectively referred to as the "TPG Entities" or "TPG Defendants." The TPG Defendants were all affiliates of TPG. The TPG Defendants were all identified in the registration statements and prospectuses for the June 2016 Offering and the August 2016 Offering as "Selling Stockholders" offering shares of ZBH common stock being sold in the offerings.

45.     Defendant KKR Biomet and the TPG Defendants are herein collectively referred to as the "Insider Selling Defendants."

46.     The Officer Defendants, Director Defendants, and Insider Selling Defendants are herein collectively referred to as the "Defendants."

## IV.

## SUBSTANTIVE ALLEGATIONS

### A.      ZBH's Post-Merger Growth Story

47.      At all relevant times, ZBH's organic revenue growth rate was the most important metric to the Company's stock price and was closely followed by investors and securities analysts.  When the plans for the Merger were announced in 2014, increased organic revenue growth was one of the rationales offered to justify combining the second and fourth largest providers of orthopedic products.  ZBH promised that cross-selling opportunities that would accelerate organic revenue growth well above market level (which was generally deemed to be 3%).  Such opportunities could not be exploited unless ZBH's manufacturing facilities were and remained in full compliance with all applicable laws, rules and regulatory standards.

### B.      Executives Tout Revenue Growth Post-Merger

48.      Organic revenue growth was a critical financial metric to the Company and was closely followed by shareholders and analysts.  Organic revenue growth was also an important justification for the Zimmer-Biomet merger.

49.      On April 24, 2014, after first announcing the merger, Zimmer's then-CFO Jim Crines stated "We expect revenues to grow in-line with the market in the short term post combination and when the integration is complete we would expect all categories to be growing ahead of their respective markets given the breath of scale and the global reach of [the] combined sales channels."  All defendants knew that effective integration of the merged companies could only be achieved if ZBH's manufacturing facilities were maintained in full compliance with all applicable laws, rules and regulations.

17

50.     On July 30, 2015, shortly after the close of the Biomet merger, Zimmer held an earnings conference call in which Zimmer executives forecasted substantial completion of their integration efforts by the end of the year.

51.     Defendant Dvorak, the CEO, claimed that Zimmer had already "achieved key milestones . . . including the implementation of critical sales infrastructure."  He added: "We expect to being realizing the benefits of our integrated sales channel . . . as we exit 2015 and progress through 2016."

52.     Dvorak also claimed that the successful integration would lead to a "host of cross-selling opportunities between [the] two legacy portfolios."  These supposed "cross-selling opportunities" were the vaguely-described goal that drove much the Company's public-facing narrative, but never materialized.

53.     By contrast, analysts were more cautious and expected below-market growth before Zimmer could take advantage of revenue synergies.  In fact, in its 2015 third quarter Form 10 Q, Zimmer reported reduced organic growth of 1.0-1.5%, compared to the 1.5-2.5 % previously projected.  Still, Dvorak reiterated the Company's plans to "substantially complete all commercial integration efforts by the end of [2015]" and to expect "[s]equential improvement throughout 2016."  Defendant Florin even touted the Company's progress on organic growth: "We will be working towards achievement of market growth rates, as we progress through 2016."

54.     But shortly after the Merger closed in June 2015, the reality diverged from the "story."  ZBH's growth rate had declined, causing much concern among investors in the fall of 2015.  As organic revenue growth languished, so did the Company's stock price.

55.     On April 28, 2015, Zimmer reported 1.2% revenue growth for the first quarter of

2015, beating expectations and subsequently raising its 2016 revenue guidance to 2.0-3.0%.

Investors were impressed with the uptick in organic growth, with the JP Morgan analyst writing

that the Company "appears to be turning the corner and has started to recover from some of the

early integration challenges."

56.     In part because of their ongoing problem with the West Campus, after the Merger

closed, ZBH corporate management requested that corporate audits of the North Campus' QS be

conducted in early 2016.  Audit reports issued on March 31, April 13, and June 7, 2016, alerted

ZBH's corporate management to even far worse "systemic issues" with respect to the QS and the

North Campus.[2]  The findings contained in the audit reports were neither minor nor technical.

Rather, ZBH admitted that the findings "self-identified major compliance-related issues in areas

such as design controls, sterile packaging, complaint handling, nonconforming material, and

[corrective and preventive actions ("CAPAs")]."[3]  The "major-compliance-related issues"

covered a wide-range of the primary components to a quality management system.

57.     At the time, Zimmer understood the seriousness of this extreme pattern of quality

lapses, even using the phrase "systemic issues" in its December 21, 2015 response to the FDA

regarding West Campus:

> We recognize and take seriously the significance of the
> observations in the FDA-483 and are committed to taking all
> actions necessary to ensure that our systems are in compliance with
> FDA requirements, and that our products are safe and effective.
> As is described in our detailed response below, ***in addition to***

---

[2]     This information was not publicly disclosed until ZBH admitted these facts in a letter to
the FDA dated December 21, 2016 (the "December 21, 2016 Letter") (a partially redacted copy
received from the FDA is attached hereto as Exhibit ("Ex.") A).

[3]     Ex. A (December 21, 2016 Letter).

> *correcting the specific items listed in the FDA-483, we have*
> *taken and are continuing take actions to address systemic issues.*

(Emphasis added.)

58.     On January 12, 2016, Dvorak told those in attendance at the JP Morgan Healthcare Conference that the merger integration process was substantially complete." Borrowing a sports analogy, he also added that the Company was "in a great position as a consequence of that to start running the offense that the combined company possesses in 2016." In his remarks, Dvorak again mentioned cross-selling opportunities and promised investors that they would "normalize" the Company "back to something that resembles a market growth rate."

59.     Predictably, ZBH's stock price increased through the first, second and third calendar quarters of 2016.

60.     In early 2016 and up to the devastating disclosures in late 2016, ZBH and the Officer Defendant aggressively insisted that the rationale of the Merger was being realized.  In press releases, conference calls with investors, and discussions with analysts, the Officer Defendants claimed that the cross-selling opportunities were taking hold, that organic revenue growth was reaccelerating, and that the organic revenue growth rate would return to market level growth and exceed market level in the second half of 2016 and 2017.  The SEC filings during 2016 described however omitted material facts about the existing conditions and regulatory risks at the primary Legacy Biomet North Campus.  Investors were not informed that ZBH was at material risk of seeing revenues and profits fall materially short of projections because ZBH had to first extensively remediate the FDA's Quality System ("QS") deficiency issues at the North Campus noted by the FDA before full production capacity could be realized.

C.     **ZBH's Facility Problems and the FDA**

61.     In late-2015, the FDA conducted an inspection of Zimmer's West Campus facility and issued an FDA Form 483 detailing ***ten negative observations***.

62.     Not just any information goes on an FDA-483.  In fact, an FDA field directive instructs inspectors not to include "[o]observations of questionable significance" in their findings.  Thus, observations included in an FDA-483 "should be significant and correlate to regulated products or processes being inspected."  The FDA has the authority to follow up with warning letters or other enforcement actions if the recipient of an FDA-483 fails to remediate the listed observations.

63.     A high number of FDA's observations pertaining to West Campus were repeats – including several that were *multiple-time* repeats.  Four of the observations dated all the way back to 2011.  Only one of the observations, Observation 10, was entirely new for 2015.

64.     No later than July 15, 2015 the Defendants began to fully apprehend the ongoing issues at the North Campus as reflected by ZBH's admissions in a December 21, 2016 "Response To FDA 483 Observations Issued To Zimmer Biomet Warsaw North Campus, November 22, 2016" (the "Response").  ZBH admitted in the Response that:

> (a)     ZBH audited Legacy Zimmer sites, legacy Biomet sites and commenced "network process audits" beginning July 15, 2015;
>
> (b)     In 2015, ZBH scheduled "corporate quality audits" to be performed at North Campus in first half of 2016;
>
> (c)     A remediation program with approved funding was established in July 2016;

(d)     "Corporate Audits" reports for the North Campus were issued on March
31, 2016, April 13, 2016 and June 7, 2016.  The audit reports identified a
total of 4 "critical observations," 35 "major observations" and 7 "minor
observations;"

(e)     "Post Market Surveillance Reconsideration Program Resources" were
approved in May 2016; and

(f)     "Quality Assurance Resource Additions" were approved in July 2016. The
Response was signed by David Kunz, Senior Vice President, and copied to
Defendant Dvorak.

65.     A late 2015 FDA inspection at the West Campus, resulted in the issuance by the
FDA of a Form 483.  Such letters are designed to advise management of "significant
objectionable conditions, relating to products and/or processes, or other violations of the [FDCA]
and related Acts . . . which were observed during the inspection."  The FDA letter detailed ten
negative observations at West Campus, including several that were multiple-time repeats dating
back to 2011.

66.     In the first half of 2016, ZBH and its facilities were under intense FDA scrutiny.
The FDA had identified serious quality deficiencies in the fall of 2015 during an inspection of
the primary Legacy Zimmer West Campus (the "West Campus").  The inspection had resulted in
the issuance of a serious FDA Form 483 ("FDA 483") identifying a large number of repeat
observations from prior FDA inspections in October and November of 2015 and in April and
May 2014.  In private correspondence to the FDA in December 2015 and February 2016, ZBH
acknowledged the severity of the "systemic issues" with the West Campus' QS and outlined
extensive remediation work that would purportedly occur during 2016 continue through at least

22

June 2017.  In the first half of 2016, substantial remediation and corrective actions were underway to address highly critical FDA inspections of Legacy Zimmer facilities in Puerto Rico (in November 2015) and Montreal (in January 2016).

67.     On June 7, 2016, Zimmer announced an acquisition of a spinal surgery company. In response to analyst concerns about another big integration project, Dvorak stated with high confidence that the Company would continue to accelerate revenue growth, in part due to the "progress that [Zimmer had] made on the Biomet side" already.  Zimmer's stock price around this time reached $120 per share.

68.     From the outside, Zimmer appeared to continue to beat expectations into the second quarter of 2016, reporting 2.7% organic revenue growth and edging closer to market-level growth figures.  Zimmer also raised it bottom end guidance to 2.5-3.0%, the key metric that most shareholders were focused on.

69.     On July 28, 2016, Dvorak stated that Zimmer "generated solid revenue acceleration in the second quarter, again above the top end of our expectations, further validating our strategies to achieve above-market revenue growth by the close of 2016."  Dvorak added: "We successfully integrated and leveraged the combined expertise and cultures of [Zimmer and Biomet], while executing on a highly complementary portfolio of technologies, services and solutions.

70.     On June 7, 2016, ZBH knew that FDA quality inspection of Legacy Biomet's flagship North Campus was imminent.  ZBH knew this because, as a manufacturer of class III devices, the Company's manufacturing facilities are subject to mandatory biennial inspections by law and the last FDA inspection of that facility had concluded on June 30, 2014.  Moreover, that prior inspection had resulted in the FDA issuing observations on an FDA Form 483, which ZBH

23

had not remediated.  A majority of ZBH's then directors also knew of the imminent FDA inspection because of their extensive experience as executive officers and/or directors of major pharmaceutical companies and familiarity with FDA regulations and regulatory practices and procedures.

71.     While the Company was grappling with serious, undisclosed internal compliance issues, Michelson and Rhodes exploited their access to material adverse inside information by sharing information with the defendant funds they controlled and allowed them to liquidate their respective shares.  KKR and TPG unloaded their holdings in Zimmer in two secondary offerings conducted in June 2016 and August 2016, before all material adverse information about Zimmer had been disclosed publicly the bad news came out.  These offerings were conducted pursuant to registration statements signed by a majority of the Board at the time of filing of this suit.

**D.     ZBH's Materially False and Misleading SEC Filings**

72.     The Defendant Directors all participated in some stage of the preparation, drafting, reviewing, signing, and approval of ZBH's Quarterly Report on Form 10-Q for the quarter ended March 30, 2016 ("Q-1, 2016 10-Q"); ZBH's Quarterly Report on Form 10-Q for the quarter ended June 30, 2016 ("Q-2, 2016 10-Q"); ZBH's Prospectus, Supplemental Prospectuses all defendant directors signed the annual reports on Form 10-K and Registration Statements described herein, which were materially false and misleading as set forth below:

(a)     The Q-1 2016 10-Q was signed by Defendants Collins and Florin on May 10, 2016;

(b)     The certifications pursuant to Section 302 of the Sarbanes Oxley Act of 2002 in the Q-1 2016 10-Q were signed by Defendant Dvorak in his capacity as ZBH's President and Chief Executive Officer and Defendant

Florin in his capacity as Senior Vice President and Chief Financial Officer on May 10, 2016;

(c)     Defendants Dvorak and Florin signed the "Certification Pursuant to 18 U.S.C. Section 1350" on May 10, 2016 which was an exhibit to the Q-1 2016 10-Q;

(d)     The Q-2 2016 10-Q was signed by Defendants Florin and Collins on August 8, 2016;

(e)     The certifications pursuant to Section 302 of the Sarbanes Oxley Act of 2002 for the Q-2 2016 10-Q were signed by Defendant Dvorak in his capacity as ZBH's President and Chief Executive officer and Defendant Florin in his capacity as Senior Vice President and Chief Financial Officer on August 8, 2016;

(f)     Defendants Dvorak and Florin signed the "Certification Pursuant to 18 U.S.C. 1350" on August 8, 2016 which was an exhibit to the Q-2, 10-Q;

(g)     Defendants Dvorak, Florin, Collins, Glasscock, Begley, Bernard, Bisaro, Boudreaux, Farrell, Hagemann, Higgins, Michaelson, Pickett and Rhodes signed or authorized the signing of the ZBH registration statements filed with the SEC for the June 2016 Offering and the August 2016 Offering, which included materially false and misleading prospectuses and incorporated by reference the materially misleading Annual Report on Form 10-K and quarterly reports on Form 10-Q; and

(h)     Throughout 2016, ZBH filed an Annual Report on Form 10-K for the annual period ended December 31, 2015 and three Quarterly Reports on

Form 10-Q for the periods ended March 31, 2016, June 30, 2016, and

September 30, 2016, respectively (the latter 10-Q however is not

implicated in this action).  Each of the filings and their respective contents

were governed by SEC rules and regulations, including but not limited to

Regulation S-K: Item 303 Requirements (management's discussion and

analysis of financial condition and results of operations); and Item 503

Requirements (Prospectus summary and risk factors).

**1.**     **Regulatory Requirements of ZBH's SEC Findings**

**a.**     **S-K Item 303 Requirements**

74.     Regulation S-K Item 303 imposes an affirmative duty on issuers to disclose

"events" or "uncertainties" that will have a material or unfavorable impact on the registrant's

future revenue.[4]

75.     Specifically, Item 303 requires issuers to disclose in the registration statement

any "trend, demand, commitment, event or uncertainty" that is "both presently known to

management and reasonably likely to have material effects on the registrant's financial

condition or results of operations."[5]  Pursuant to Item 303(a), for a fiscal year, a registrant has

an affirmative duty to: (i) describe any unusual or infrequent events or transactions or any

significant economic changes that materially affected the amount of reported income from

continuing operations and, in each case, indicate the extent to which the income was so

affected; (ii) describe any known trends or uncertainties that have had or that the registrant

---

[4]     *See* 17 C.F.R. § 229.303(a)(3)(i) and (ii); Management's Discussion and Analysis of
Financial Condition and Results of Operation, S.E.C. Release No. 33-6835 (May 18, 1989)
("S.E.C. Release No. 33-6835"), available at https://www.sec.gov/rules/interp/33-6835.htm.

[5]     *See id.*; 17 C.F.R. § 229.303(a)(3)(ii).

reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.  If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.[6]

76.    Thus, even a one-time event, if "reasonably expect[ed]" to have a material impact of results, must be disclosed.  Examples of such required disclosures include:  "[a] reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.[7]  Accordingly, as the SEC has repeatedly emphasized, the "specific provisions in Item 303 [as set forth above] require disclosure of forward-looking information."[8]  Indeed, the SEC has stated that disclosure requirements under Item 303 are "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company" and "a historical and prospective analysis of the registrant's financial condition ... with particular emphasis on the registrant's prospects for the future."[9]  Thus, "material forward-looking information regarding known material trends and

---

6    See 17 C.F.R. § 229.303(a)(3)(i)-(ii); *see also* S.E.C. Release No. 33-6835 ("Other non-recurring items should be discussed as unusual or infrequent events or transactions that materially affected the amount of reported income from continuing operations.") (citation and quotation omitted).

7    S.E.C. Release No. 33-6835.

8    *Id.*

9    *Id.*; *see also id.* at *17.

uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects."[10]

### b.     Reg. S-K Item 503 Requirements Were Applicable to the 2016 Offering Materials

77.     Regulation S-K Item 503 is intended "to provide investors with a clear and concise summary of the material risks to an investment in the issuer's securities."[11] Accordingly, Item 503 requires that offering documents "provide under the caption 'Risk Factors' a discussion of the most significant factors that make the offering speculative or risky."[12] The discussion of risk factors must be specific to the particular company and its operations and should explain how the risk affects the company and/or the securities being offered. Generic or boilerplate discussions do not tell the investors how the risks may affect their investment.[13]

### c.     Other Regulatory Requirements Were Applicable to the Periodic Financial Statements Incorporated by Reference into Registration Statements

78.     Item 8 of Form 10-K and Item 1 of Form 10-Q, via reference to Regulation S-X [17 C.F.R. §210] required ZBH to file with the SEC financial statements prepared in conformity with Generally Accepted Accounting Principles ("GAAP"). Regulation S-X [17 C.F.R. § 210.4-

---

[10]   *See* Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations, S.E.C. Release No. 33-8350 (Dec. 19, 2003), available at https://www.sec.gov/rules/interp/33-8350.htm.

[11]   *See* Securities Offering Reform, S.E.C. Release No. 33-8501 (Nov. 3, 2004), available at https://www.sec.gov/rules/proposed/33-8501.htm.

[12]   17 CFR § 229.503(c).

[13]   Statement of the Commission Regarding Disclosure of Year 2000 Issues and Consequences by Public Companies, Investment Advisers, Investment Companies, and Municipal Securities Issuers, S.E.C. Release No. 33-7558 (July 29, 1998), available at https://www.sec.gov/rules/interp/33-7558.htm.

01.(a)(l)] states that financial statements filed with the SEC that are not prepared in conformity

with GAAP are presumed to be misleading  and inaccurate.

79.     Item 7 of Form 10-K and Item 2 of Form 10-Q required ZBH to furnish the

information called for under Item 303 of Regulation S-K [17 C.F.R. § 229.303], *Management's*

*Discussion and Analysis of Financial Condition and Results of Operations* ("MD&A").  In 1989,

the SEC issued S.E.C. Release No. 33-6835, which provided interpretative guidance associated

with the requirements of Item 303 of Regulation S-K and states, in pertinent part:

> A disclosure duty exists where a trend, demand, commitment,
> event or uncertainty is both presently known to management and
> reasonably likely to have material effects on the registrant's
> financial condition or results of operation.

80.     The MD&A ZBH filed with the SEC on Forms 10-K and 10-Qs filed in 2016

contained materially false and misleading disclosures about the Company's operating

performance and failed to disclose material events and uncertainties associated with ZBH's

major brands and internal control weaknesses, which were then known to management and were

reasonably likely to have a material effect on the Company's future operating results.

81.     Item lA of Form 10-K and Form 10-Q required ZBH to furnish the information

called for under Item 503 of Regulation S-K [17 C.F.R. § 229.503], *Risk Factors.*  Item 503 of

Regulation S-K required ZBH to disclose the most significant matters making an investment in

the Company risky.

82.     The Forms 2015 10-K and 10-Qs ZBH filed with the SEC in 2016 failed to

disclose material risks associated with its manufacturing operations.

83.     Item 9A of Form 10-K and Item 4 of Form 10-Q required ZBH to furnish the

information called for under Item 307 of Regulation S-K [17 C.F.R. § 229.307], *Disclosure*

*Controls and Procedures,* and Item 308 of Regulation S-K [17 C.F.R. § 229.308], *Internal*

*Control over Financial Reporting.*

84.    The Registration Statements issued in June and August 2016, which

incorporated by reference all previously filed ZBH periodic financial reports filed with the SEC,

did not comply with the above statutory mandates.

### d.    The June 2016 Offering Materials

85.    On June 13, 2016, ZBH and the Insider Selling Defendants offered for sale

11,116,533 shares of ZBH common stock in the June 2016 Offering at a price of $115.85 per

share for net proceeds of approximately $1.28 billion.

86.    The June 2016 Offering was conducted pursuant to a registration statement on

Form S-3 that ZBH filed with the SEC on February 4, 2016 (the "Registration Statement"). The

Registration Statement was signed by Defendants Dvorak, Florin and Collins and the Director

Defendants.

87.    ZBH supplemented the Registration Statement with a Preliminary Prospectus

Supplement filed with the SEC on June 13,2016 (the "June Preliminary Prospectus") and a Final

Prospectus Supplement filed with the SEC on June 15, 2016 (the "June Final Prospectus" and

together with the Registration Statement and the June Preliminary Prospectus, the "June Offering

Materials").

88.    The June Offering Materials incorporated by reference, among others: (i) ZBH's

Annual Report on Form 10-K for the year ended December 31, 2015 (filed on February 29,

2016) (the "2015 10-K"); and (ii) ZBH's Quarterly Report on Form 10-Q for the quarter ended

March 31, 2016 (filed with the SEC on May 10,2016) (the "Q1 2016 10-Q").

89.     The June Offering Materials were defective because they contained untrue statements of material facts and/or omitted to state facts necessary to make the statements made therein not misleading and the June Offering Materials were not prepared in accordance with the rules and regulations governing their preparation.

90.     The June Preliminary Prospectus and the June Final Prospectus both represented that any "forward-looking statements are based upon the current beliefs and expectations of our management" and purported to identify, among others, the following generic and boilerplate "risks and uncertainties:" (i) "the risks and uncertainties related to our ability to successfully integrate the operations, products, employees and distributors of the legacy companies;"(ii) "our ability to remediate matters identified in any inspectional observations or warning letters issued by the FDA;" and (iii) "the success of our quality and operational excellence initiatives."

91.     The above (purported) risk warning was materially false and/or misleading and/or omitted material facts necessary to make the statement not misleading.  Specifically, the (purported) risk warning was materially false and/or misleading when made because it failed to warn investors: (i) that ZBH would be unable to satisfy demand for its products while remediating the QS deficiencies at the North Campus; and (ii) that ZBH would have to disrupt production and distribution of key products because ZBH was manufacturing, sterile packing, and distributing products from the North Campus despite knowing that "systemic issues" with the QS had not been adequately remediated and knowing that an FDA inspection of the facility was imminent.

92.     Additionally, the statement set forth above in the June Offering Materials was materially false and/or misleading because it failed to disclose: (i) that there were "systemic issues" with the QS at the North Campus requiring highly disruptive, time consuming and costly

remediation and corrective activities; (ii) that ZBH was not taking prompt and meaningful

actions to remediate and correct the "systemic issues" at the North Campus; (iii) that an FDA

inspection of the Legacy Biomet North Campus was imminent; (iv) that ZBH would be unable to

meet demand for its products while remediating the "systemic issues" with the QS at the North

Campus; and (v) that as a result of the foregoing, ZBH was unable to accelerate organic revenue

growth to above market level in the second half of 2016.

93.    The 2015 10-K, which was incorporated by reference into the June Offering

Materials, contained a number of stale risk factors that purported to caution investors about

potential risks and uncertainties and implied that such risks had not occurred.  Additionally, the

Q1 2016 10-Q, which was also incorporated by reference into the June Offering Materials,

directed investors to the same risk warnings contained in the 2015 10-K and added: "*There have

been no material changes in our risk factors from those disclosed in our Annual Report* on Form

10-K for the year ended December 31, 2015."

94.    The June Offering Materials incorporated the following risk factor from the 2015

10-K and the Q1 2016 10-Q (which had been incorporated from the 2015 10-K):

> Successful integration of Biomet and anticipated benefits of the
> Biomet merger are not assured and integration matters could divert
> attention of management away from operations.  Also, the merger
> could have an adverse effect on our business relationships.
>
> Although Biomet has become an indirect wholly owned subsidiary
> of ours, it is initially continuing its operations on a basis that is
> separate  from  the  legacy Zimmer operations.  There can be no
> assurance that Biomet will be able to maintain and grow its
> business and operations ...
>
> Our ability to realize the anticipated benefits of the Biomet merger
> will depend, to a large extent, on our ability to integrate the legacy
> businesses.  Integrating and coordinating certain aspects of the
> operations and personnel of Biomet with ours involves complex
> operational, technological and personnel-related challenges.  This

process is time-consuming and expensive, disrupts the businesses of both companies and may not result in the full benefits expected by us, including cost synergies expected to arise from supply chain efficiencies and overlapping general and administrative functions. The *potential difficulties, and resulting costs and delays,* include:

• managing a larger combined company;
• consolidating corporate and administrative infrastructures;
• *issues in integrating manufacturing, warehouse and distribution facilities*,
research and development and sales forces;
• difficulties attracting and retaining key personnel;
• loss of customers and suppliers and inability to attract new customers and suppliers;
• unanticipated issues in integrating information technology, communications and other systems;
• incompatibility of purchasing, logistics, marketing, administration and other systems and processes; and
• unforeseen and unexpected liabilities related to the merger or Biomet's business.

Additionally, the integration of our and Biomet's operations, products and personnel may place a significant burden on management and other internal resources.  The attention of our management may be directed towards integration considerations and may be diverted from our day-to-day business operations, and matters related to the integration may require commitments of time and resources that could otherwise have been devoted to other opportunities that might have been beneficial to us.  The diversion of management's attention, and any difficulties encountered in the transition and integration process, could harm our business, financial condition and operating results.

Even if our businesses are successfully integrated, we may not realize the full benefits of the merger, including anticipated synergies, cost savings or growth opportunities, within the expected timeframe or at all.  In addition, we expect to incur significant integration and restructuring expenses to realize synergies.  However, many of the expenses that will be incurred are, by their nature, difficult to estimate accurately.  These expenses could, particularly in the near term, exceed the savings that we expect to achieve from elimination of duplicative expenses and the realization of economies of scale and cost savings. Although we expect that the realization of efficiencies related to the integration of the businesses may offset incremental transaction, merger-related and restructuring costs over time, we

cannot give any assurance that this net benefit will be achieved in
the near term, or at all.

Any of these matters could adversely affect our businesses or harm
our financial condition, results of operations or business prospects.

(Emphasis added.)

95.     The statements were materially false and/or misleading when made for the same

reasons set forth above.  Additionally, those statements were knowingly and/or recklessly

materially false and/or misleading because, despite warning about "potential difficulties, and

resulting costs and delays" relating to "issues in integrating manufacturing ... facilities," ZBH did

not update its risk disclosure in  light of the  new information from the corporate audit reports

(issued on March 31, April 13, and June 7, 2016) alerting ZBH management to the fact that the

QS at the Legacy Biomet North Campus were not compliant with FDA standards/regulations and

it would require substantial time and money (in excess of one year and $300 million) to

remediate the "systemic issues" and result in substantial disruption to the supply of essential

Legacy Biomet products.

96.     The June Offering Materials incorporated the following risk factor representation

from the 2015 10-K and the Q1 2016 10-Q (which had been incorporated from the 2015 10-K):

We are subject to various governmental regulations relating to the
manufacturing, labeling and marketing of our products, non-
compliance with which could adversely affect our business,
financial condition and results of operations.

***

*Both before and after a product is commercially released, we have
ongoing responsibilities under FDA regulations.  Compliance with
the FDA's requirements, including the Quality System regulation,*
recordkeeping regulations, labeling and promotional requirements
and adverse event reporting regulations, *is subject to continual
review and is monitored rigorously through periodic inspections
by the FDA, which may result in observations on Form 483, and in
some cases warning letters, that require corrective action, or other*

34

*forms of enforcement. If the FDA were to conclude that we are
not in compliance with applicable laws or regulations,* or that any
of our medical devices are ineffective or pose an unreasonable
health risk, the FDA could ban such medical devices, detain or
seize adulterated or misbranded medical devices, order a recall,
repair, replacement, or refund of payment of such devices, refuse
to grant pending premarket approval applications, refuse to
provide certificates to foreign governments for exports, and/or
require us to notify healthcare professionals and others that the
devices present unreasonable risks of substantial harm to the public
health. The FDA may also impose operating restrictions on a
company-wide basis, enjoin and restrain certain violations of
applicable law pertaining to medical devices and assess civil or
criminal penalties against our officers, employees or us. The FDA
may also recommend prosecution to the DOJ. Any adverse
regulatory action, depending on its magnitude, may restrict us from
effectively marketing and selling our products and could have a
material adverse effect on our business, financial condition and
results of operations.

In 2012, we received a warning letter from the FDA citing
concerns relating to certain processes pertaining to products
manufactured at our Ponce, Puerto Rico manufacturing facility. In
June 2015, Biomet received a warning letter from the FDA that
requested additional information to allow the FDA to evaluate the
adequacy of Biomet's responses to certain Form 483 observations
issued following an inspection of Biomet's Zhejiang, China
manufacturing facility in January 2015. As of December 31, 2015,
these warning letters remained pending. Until the violations are
corrected, we may become subject to additional regulatory action
by the FDA, the FDA may refuse to grant premarket approval
applications and/or the FDA may refuse to grant export
certificates, any of which could have a material adverse effect on
our business, financial condition and results of operations.
Additional information regarding these and other FDA regulatory
matters can be found in Note 20 to the consolidated financial
statements.

(Emphasis added.)

97.     The above statement was materially false and/or misleading when made for the

same reasons set forth above.

98.     The June Offering Materials incorporated the following risk factor from the 2015

10-K and the Q1 2016, 10-Q (which had been incorporated from the 2015 10-K):

> Interruption of our manufacturing operations could adversely affect our business, financial condition and results of operations.
>
> We have manufacturing sites all over the world. In some instances, however, the manufacturing of certain of our product lines is concentrated in one or more of our plants. Damage to one or more of our facilities from weather or natural disaster-related events, or *issues in our manufacturing arising from* failure to follow specific internal protocols and procedures, *compliance concerns relating to the Quality System regulation and Good Manufacturing Practice requirements,* equipment breakdown or malfunction or other factors *could adversely affect our ability to manufacture our products. In the event of an interruption in manufacturing, we may be unable to move quickly to alternate means of producing affected products or to meet customer demand. In the event of a significant interruption, for example, as a result of a failure to follow regulatory protocols and procedures, we may experience lengthy delays in resuming production of affected products* due primarily to the need for regulatory approvals. As a result, we may experience loss of market share, which we may be unable to recapture, and harm to our reputation, which could adversely affect our business, financial condition and results of operations.

(Emphasis added.)

99.    The above statement was materially false and/or misleading when made for the same reasons set forth above.

100.    The Company's 2015 10-K, under the heading "Government Regulation and Compliance," stated:

> [W]e have ongoing responsibilities under FDA regulations. The FDA reviews design and manufacturing practices, labeling and record keeping, and manufacturers' required reports of adverse experiences and other information to identify potential problems with marketed medical devices. *We are also subject to periodic inspection by the FDA for compliance with the FDA's Quality System regulations among other FDA requirements,* such as restrictions on advertising and promotion. *The Quality System regulations govern the methods used in, and the facilities and controls used for, the design, manufacture, packaging and servicing of all finished medical devices intended for human use.* If the FDA were to conclude that we are not  in compliance with applicable laws or regulations, or that any of our medical devices are ineffective or pose an unreasonable health risk, the FDA could

require us to notify healthcare professionals and others that the
devices present unreasonable risks of substantial harm to the public
health, order a recall, repair, replacement, or refund payment of
such devices, detain or seize adulterated or misbranded medical
devices, or ban such medical devices.

(Emphasis added.)

101.    The Company's Q1 2016 10-Q contained the following statement (which was

substantially the same as a statement contained in the 2015 10-K) under the heading "Regulatory

Matters, Government Investigations and Other Matters":

> *FDA warning letters*: In September 2012, Zimmer received a
> warning letter from the U.S. Food and Drug Administration
> ("FDA") citing concerns relating to certain processes pertaining to
> products manufactured at our Ponce, Puerto Rico manufacturing
> facility.  In June 2015, Biomet received a warning letter from the
> FDA that requested additional information to allow the FDA to
> evaluate the adequacy of Biomet's responses to certain Form 483
> observations issued following an inspection of Biomet's Zhejiang,
> China manufacturing facility in January 2015.  We have provided
> detailed responses to the FDA as to our corrective actions and will
> continue to work expeditiously to address the issues identified by
> the FDA during inspections in Ponce and Zhejiang.  As of March
> 31, 2016, these warning letters remained pending.  Until the
> violations are corrected, we may be subject to additional regulatory
> action by the FDA, including seizure, injunction and/or civil
> monetary penalties.  Additionally, requests for Certificates to
> Foreign Governments related to products manufactured at the
> Ponce and Zhejiang facilities may not be granted and premarket
> approval applications for Class III devices to which the quality
> system regulation deviations at these facilities are reasonably
> related will not be approved until the violations have been
> corrected.  *In addition to responding to the warning letters
> described above, we are in the process of addressing various FDA
> Form* 483 *inspectional observations at certain of our
> manufacturing facilities.*  The ultimate outcome of these matters is
> presently uncertain.

(Emphasis added.)

102.    The 2015 l0-K contained the following statement about the Company's outlook

for 2016: "We expect pro forma sales growth will improve in the last half of the year compared

to the first half as our sales force stabilizes, we take advantage of cross-selling opportunities and we anniversary out of many sales force dissynergies caused by the merger."

103.    Under the heading "2016 Outlook," the Company's Q1 2016 10-Q also contained the following statement that was substantially similar to the above statement from the 2015 10-K: "We expect pro forma sales growth will improve in the second half of the year compared to the first half as our sales force stabilizes, we take advantage of cross-selling opportunities and we anniversary out of the impact of product line divestitures and certain sales force dissynergies caused by the merger."

104.    The statements above incorporated by reference into the June Offering Materials were materially false and misleading and/or omitted material facts necessary to make the statement not misleading. Specifically, the statements were materially false and/or misleading when made because they failed to disclose: (i) that there were "systemic issues" with the QS at the North Campus requiring highly disruptive, time consuming and costly remediation and corrective activities; (ii) that ZBH was not taking prompt and meaningful actions to remediate and correct the "systemic issues" at the North Campus; (iii) that an FDA inspection of the Legacy Biomet North Campus was imminent; (iv) that ZBH was unable to meet demand for its products while remediating the "systemic issues" with the QS at the North Campus; and (v) that as a result of the foregoing, ZBH was unable to accelerate organic revenue growth to above market level in the second half of 2016.

105.    The June Offering Materials were materially false and misleading because they failed to disclose the following known adverse trends and/or uncertainties that ZBH was required to disclose under Item 303, including: (i) that there were "systemic issues" with the QS at the North Campus requiring highly disruptive, time consuming and costly remediation and

corrective activities; (ii) that ZBH was not taking prompt and meaningful actions to remediate and correct the "systemic issues" at the North Campus; (iii) that an FDA inspection of the Legacy Biomet North Campus was imminent; (iv) that ZBH was unable to meet demand for its products while remediating the "systemic issues" with the QS at the North Campus; and (v) that as a result of the foregoing, ZBH was unable to accelerate organic revenue growth to above market level in the second half of 2016.

106.    Additionally, the June Offering Materials were also materially false and misleading because they failed to disclose the additional known adverse trend and/or uncertainty in violation of Item 303: that the Legacy Biomet North Campus required substantial remediation, which would take considerable time and money (which would exceed more than a year and cost upwards of $300 million), which was particularly evident to ZBH Collins in light of the significant time and funds that were being expended for the purported ongoing remediation activities for the Legacy Zimmer West Campus.

### e.    The August 8, 2016 Quarterly Report on Form 10-Q

107.    On August 8, 2016, ZBH filed its Quarterly Report on Form 10-Q for the 2016 second quarter (the "Q2 2016 10-Q") with the SEC. The Company's Q2 2016 10-Q reaffirmed the Company's financial results previously announced on July 28, 2016, and was signed by Defendants Florin and Collins.

108.    Under the heading "Regulatory Matters, Government Investigations and Other Matters," the Q2 2016 10-Q contained the following statement:

> *FDA warning letters:* In September 2012, Zimmer received a warning letter from the U.S. Food and Drug Administration ("FDA") citing concerns relating to certain processes pertaining to products manufactured at our Ponce, Puerto Rico manufacturing facility. In June 2015, Biomet received a warning letter from the FDA that requested additional information to allow the FDA to

39

evaluate the adequacy of Biomet's responses to certain Form 483 observations issued following an inspection of Biomet's Zhejiang, China manufacturing facility in January 2015.  In May 2016, Zimmer received a warning letter from the FDA related to observed non-conformities with current good manufacturing practice requirements of the Quality System regulation at our facility in Montreal, Quebec, Canada.  We have provided detailed responses to the FDA as to our corrective actions and will continue to work expeditiously to address the issues identified by the FDA during inspections in Ponce, Zhejiang and Montreal.  As of June 30, 2016, these warning letters remained pending.  Until the violations are corrected, we may be subject to additional regulatory action by the FDA, including seizure, injunction and/or civil monetary penalties.  Additionally, requests for Certificates to Foreign Governments related to products manufactured at the Ponce facility may not be granted and premarket approval applications for Class III devices to which the quality system regulation deviations at these facilities are reasonably related will not be approved until the violations have been corrected. *In addition to responding to the warning letters described above, we are in the process of addressing various FDA Form* 483 *inspectional observations at certain of our manufacturing facilities.*  The ultimate outcome of these matters is presently uncertain.

(Emphasis added.)

109.    The Q2' 2016 10-Q also contained the following statement:

*Results for the Three and Six Month Periods ended June 30, 2016*

Our results have been significantly impacted by the Biomet merger.  In 2016, *we have continued to make progress in our* commercial and *operational integration across all geographies and functions.*  As we expected, our sales growth rates were below market growth rates in the first half of 2016, *but we saw sequential improvement from the second half of 2015 and expect to end 2016 at or above market growth rates.*

(Emphasis added.)

110.    The above statements were materially false and/or misleading and/or omitted

material facts necessary to make the statement not misleading.  Specifically, the statements were

materially false and/or misleading when made because they failed to disclose: (i) that there were

"systemic issues" with the QS at the North Campus requiring highly disruptive, time consuming and costly remediation and corrective activities; (ii) that ZBH was not taking prompt and meaningful actions to remediate and correct the "systemic issues" at the North  Campus; (iii) that an FDA inspection of the Legacy Biomet North Campus was imminent; (iv) that ZBH was unable to meet demand for its products while remediating the "systemic issues" with the QS at the North Campus; and (v) that as a result of the foregoing, ZBH was unable to accelerate organic revenue growth to above market level in the second half of 2016.

111.    The Q2 2016 10-Q also directed readers to risk warnings in the 2015 10-K and contained the following statement:  "Except as set forth below, *there have been no material changes in our risk factors from those disclosed in our Annual Report on Form 10-K for the year ended December 31, 2015*" (emphasis added).[14]

112.    The above statement, along with the incorporated risk warning statements from the 2015 10-K quoted above were materially false and/or misleading when made for the same reasons set forth above.  As explained above, these (purported) risk warnings were materially false and/or misleading when made because they failed to warn investors that, among others: (i) the Company would have to disrupt production/distribution of products because ZBH was manufacturing and distributing products from the North  Campus - despite "systemic issues" with the QS  when an FDA inspection of the facility was imminent; and (ii) the Company would

---

[14]    The Q2 2016 10-Q added one risk warning purporting to caution investors that "[w]e may not be able to effectively integrate newly acquired businesses into our operations or achieve expected cost savings or profitability."  Three other changes/updates to the risk warnings pertained to unrelated matters such as the United Kingdom's referendum on whether to leave the European Union, future sales by stockholders (*i.e.*, KKR and TPG) into the public market, and a prior governmental Foreign Corrupt Practices Act investigation of Biomet by the SEC and DOJ which eventually in 2017 resulted in a Deferred Prosecution Agreement for ZBH and approximately 23 million in fines.

be unable to continue satisfying the demand for its products while remediating the "systemic issues" with the North Campus' QS identified in corporate audit reports on March 31, April 13, and June 7, 2016.

### f.   The August 2016 Offering Materials

113.   On August 9, 2016, ZBH and the Insider Selling Defendants offered for sale 7,440,675 shares of ZBH common stock at a price of $129.75 per share for net proceeds of $960 million.

114.   On February 4, 2016, ZBH filed the Registration Statement on Form S-3 with the SEC in connection with the August 2016 Offering. The Registration Statement was signed by Defendants Dvorak, Florin and Collins and the Director Defendants.

115.   ZBH supplemented the Registration Statement with a Preliminary Prospectus Supplement filed with the SEC on August 9, 2016 (the "August Preliminary Prospectus") and a Final Prospectus Supplement filed with the SEC on August 11, 2016 (the "August Final Prospectus," and together with the Registration Statement and the August Preliminary Prospectus, the "August Offering Materials").

116.   The August Offering Materials incorporated by reference, among others: (i) ZBH's Annual Report on Form 10-K for the year ended December 31, 2015 (filed on February 29, 2016); (ii) ZBH's Quarterly Report on Form 10-Q for the quarter ended March 31, 2016 (filed with the SEC on May 10, 2016); and (iii) ZBH's Quarterly Report on Form 10-Q for the quarter ended June 30, 2016 (filed with the SEC on August 8, 2016).

117.   The August Offering Materials were defective because they contained untrue statements of material facts and/or omitted to state facts necessary to make the statements made

therein not misleading and the August Offering Materials were not prepared in accordance with the rules and regulations governing their preparation.

118.    The August Offering Materials repeated and incorporated the false/misleading statements from the June Offering Materials (which were incorporated by reference from the Company's 2015 10-K and Q1'16 10-Q) contained above. Those statements were materially false or misleading and/or omitted material facts required to be stated therein, for the same reasons set forth above.

119.    The August Offering Materials incorporated the same statements from the Q2'16 10-Q described herein, which were materially false or misleading and/or omitted material facts required to be stated therein, for the same reasons set forth herein.

120.    The August Offering Materials were also materially misleading because they omitted material information required to be disclosed under Reg. S-K Item 303.  As alleged above, with respect to the June Offering Materials, the August Offering Materials failed to disclose the same known adverse trends and/or uncertainties identified above that were omitted from June Offering Materials.

121.    On September 12, 2016, the FDA commenced an unannounced "for cause" inspection of North Campus.  At the conclusion of the North Campus inspection, on November 22, 2016, the FDA issued a 57-page FDA Form 483 letter detailing extensive problems with the North Campus manufacturing facility.  The FDA uncovered *fourteen* top-level deficiencies, most of which include multiple subparts and several pages of supporting detail each.

**E.     The Conditions and Events Concealed by Defendants Were Eventually Revealed, Causing ZBH's Stock Price to Plummet, Wipe Out Billions of Market Capitalization, and Expose ZBH to Potential Liability and Related Cost and Distraction from Securities Class Action Litigation**

122.     When ZBH reported its Q3'16 financial results on October 31, 2016, the Company shocked investors and analysts by reporting decelerating revenue growth in Q3 2016 and lowering its organic revenue growth guidance for Q4 2016.  During a conference call that day, Defendants Dvorak and Florin blamed "variable sales performance" in Q3 2016 on "unanticipated supply constraints, related to our transitioning supply chain infrastructure:"

> ***Variable commercial performances by our sales were in part caused by unanticipated supply constraints, related to our transitioning supply chain infrastructure***.  This resulted in shortfalls of needed implants and additional instrument sets, to fully exploit sales opportunities in key product categories.
>
> In response to this challenge, we've accelerated work to enhance certain aspects of our supply chain infrastructure as we harmonize and optimize our sourcing, manufacturing and quality management systems.

(Emphasis added.)

123.     On this news, the price of ZBH common stock fell $17.75 per share, or nearly 14%, to close on October 31, 2016, at $105.40 per share, on usually heavy trading volume.  The disclosure wiped out more than $3.4 billion of market capitalization in a single day.

124.     On November 8, 2016, ZBH was forced to admit that the supply shortages and lowered organic revenue growth guidance of Q4 2016 had been caused by issues with the Legacy Biomet North Campus.  That day, ZBH issued a statement in response to the analyst report and admitted that issues with North Campus had actually been factored into the lowered guidance ZBH announced on October 31, 2016 (even though ZBH had omitted this fact when announcing the guidance):

[A]s discussed on the third quarter earnings conference call, the Company has also accelerated work to enhance certain aspects of its supply chain infrastructure as it harmonizes and optimizes its sourcing, manufacturing and quality management systems. ***While these ongoing efforts have in instances led to certain product shipment delays, including product manufactured at the legacy Biomet operation in Warsaw, Indiana***, the Company is making excellent progress in addressing the issues and many of the shipment delays are already resolved and the impacted product has been released for commercial distribution. The Company expects to return to full shipping capacity with the impacted products over the next few weeks.

(Emphasis added.)

125.    On this news, shares of ZBH fell another $2.62 per share, to close on November 8, 2016 at $101.3 per share, on usually heavy trading volume. The disclosure wiped out roughly $500 million worth of market capitalization in a single day.

126.    ZBH admitted that the deceleration of revenue growth had been, at least in part, caused by "operational process enhancements that have resulted in various shipment delays." An analyst report issued that same day downgraded Zimmer stock and stated that, based on the analyst's investigation, Zimmer's problems were caused in part by product shipment holds imposed by the FDA during its inspection of North Campus.

127.    In a December 21, 2016 response to the FDA, Zimmer admitted that "after the merger was closed, Zimmer Biomet Corporate directed corporate quality audits to be performed at the North Campus in the first half of 2016. These audits self-identified major compliance-related issues in areas such as design controls, sterile packaging, complaint handling, nonconforming material, and [corrective and preventative actions.]"

## F.    Former Employees Alleged Fraud by Company's Management

128.    In early November 2016, Northcoast Research reported on the resignation of former Zimmer executive Robin Barney ("Barney"). Barney alleged in a 2017 lawsuit that she

45

was forced out of the Company for refusing to go along with a scheme to conceal the problems at North Campus. *See Barney v. Zimmer Biomet Holdings, Inc.*, 3:17-cv-00616-JD-MGG (N.D. Ind.).

129.    Prior to her abrupt departure in or around early-November 2016, Barney was Senior Vice President of Global Operations and Logistics and one of only twelve executives who reported directly to defendant Dvorak.

130.    Barney was a key figure on issues related to quality and manufacturing and was included on investigation-related correspondence with the FDA, including the Company's February 12, 2016 response to the FDA regarding West Campus, which prompted Zimmer's extensive series of internal audits.

131.    In her complaint, Barney alleged that Zimmer management, including defendants Dvorak and Florin, instructed her to commit what she believed was "securities fraud" and to "concoct a story" regarding North Campus and the Company's third quarter 2016 revenue miss.

132.    In particular, Barney alleges that despite the demand, she refused to make such material misrepresentations to investors.  Specifically, the Barney complaint alleges:

> Around October of 2016, Zimmer Biomet's Chief Financial Officer [Florin] demanded that Ms. Barney concoct a "story' to mislead Zimmer Biomet investors about the root cause of the 2016 Q3 shortfalls in sales on an upcoming investor call that would take place on November 1, 2016.  Ms. Barney refused to make material misrepresentations to the investors.

133.    The Company also instructed Barney to blame certain individuals at North Campus for the problems and then to fire them under false pretexts.  Barney refused and claimed that she had no choice but to resign.

134.    In particular, the Barney complaint alleges:

> On October 29, 2016, Zimmer Biomet's Chief Executive Officer
> [Dvorak] called Ms. Barney's cellular telephone and instructed Ms.
> Barney to make immediate, significant organizational changes as a
> result of an ongoing U.S. Foods and Drug Administration audit
> that began on September 12, 2016, which would result in
> employees being terminated for cause under a false pretext.  Ms.
> Barney refused to terminate any employees for cause as a result of
> the FDA audit because she did not feel it would be ethical or
> truthful to do so.  Zimmer Biomet's CEO [Dvorak] stated that he
> was not happy with her refusal, and that they would talk further
> about it.

135.    Barney submitted her resignation via email on October 29, 2016, with an effective date of November 11, 2016.

136.    Similar allegations were echoed in a separate lawsuit filed by another ex-employee, Terry Martin ("Martin").  *See Martin v. Zimmer Biomet Inc., et al.*, 3:17-cv-00615-JD-MGG (N.D. Ind.).  Prior to his termination on February 10, 2017, Martin was Senior Director of Facilities and Maintenance and was assigned to the West Campus facility.

137.    In a securities class action captioned *Shah v. Zimmer Biomet Holdings, Inc.*, 3:16-cv-00815 (N.D. Ind. Dec. 2, 2016), stock purchaser plaintiffs filed securities law claims on behalf of investors who purchased ZBH stock between June 7, 2016 and November 7, 2016 and suffered investment losses.  In that case, the plaintiffs allege that ZBH and its officers and directors made false and misleading statements to a class of stock purchasers during the class period, in violation of the Exchange Act and the Securities Act of 1933 (the "Securities Act").

138.    In particular, the stock purchaser plaintiffs allege that during the summer and fall of 2016, the defendants made false and misleading statements touting ZBH's improving performance and post-merger business prospects, while failing to disclose that the Company was managing a host of regulatory and compliance problems that jeopardized its ability meet

guidance, and that one of its core facilities (North Campus) needed a complete overhaul, severely limiting product supply.

139.    The stock purchaser plaintiffs' allegations are further supported by two former employees of the Company who worked at North Campus during remediation.  One such employees, a senior manager, alleges that she was encouraged by at least one executive to "concoct" a story about ZBH's revenue shortfall and blame certain employees for the problems, which she refused to do.

140.    By order dated September 26, 2018 (Docket 119), U.S. District Court Judge Philip P. Simon denied various defendants' motions to dismiss the securities claims.  With respect to the fraud-based Exchange Act Section 10(b) claims against ZBH and its officers, the Court held that the plaintiffs alleged with particularity that (i) ZBH and the defendants omitted information from their statements regarding the Company's quality and compliance problems that they had a duty to disclose, (ii) that the information they failed to disclose was material, and (iii) that the defendants acted with scienter, or intent to defraud.  *See* 348 F. Supp. 3d 821 (N.D. Ind. 2018).

141.    The Court further held that the plaintiffs stated claims for Securities Act claims against twelve directors in connection with the June and August 2016 secondary offerings, including a majority of the current Board (8 out of 11 directors), arising out of false and misleading statements contained in the registration statements they signed (and related offering materials) for the June and August 2016 KKR and TPG offerings.  As of the filing of this complaint, the *Shah* litigation is the subject of a settlement awaiting court approvals. Some of the Director Defendants named therein were directors at the time of filing of this suit.  Upon

information and belief, the individual Zimmer directors and officers named therein are not making any personal contribution to the settlement.

**G.    Director And Officer Defendants' Failure To Perform Their Duties Harmed the Company**

142.    Because of the magnitude of the "systemic issues" identified in the corporate audit reports, it was obvious to ZBH officers and directors that ZBH would not be able to remediate the issues prior to the expected FDA inspection of the North Campus.  Not only was ZBH already saddled with "systemic issues" with the West Campus' QS (as well as the Puerto Rico and Montreal facilities), but the issues identified with the North Campus' QS were far more severe.  The North Campus QS would ultimately need over a year of extensive remediation work costing over $300 million during which its production capabilities would be severely limited.

143.    As a medical device company, compliance with FDA regulations, including quality manufacturing regulations, was one of the most important aspects of ZBH's operations. For this reason, the Company's proxy materials explained, "The full Board considers specific risk topics, including risk-related issues pertaining to laws and regulations enforced by the [FDA]."  The proxy materials also indicated that the directors received "detailed regular reports … that include discussions of the risks and exposures," and that directors were "routinely informed of developments that could affect our risk profile."

144.    ZBH, its executives, and its Board were nearly all seasoned veterans of the medical device industry and well versed in FDA quality regulations, compliance, and the risks associated with not complying with FDA regulations.  As a result, ZBH and its senior officers and directors understood the significance and magnitude of the issues uncovered by the corporate audit reports.

145.    The products produced and distributed at the North Campus included Legacy Biomet's most important products.  As one of the Company's officers would later admit, the products provided ZBH with is most competitive opportunities and were "strategically relevant" to ZBH's ability to accelerate organic revenue growth.  ZBH could not meet existing demand for its products while promptly and meaningfully remediating these issues.  In other words, the Company could not simultaneously fix the issues and generate the supply necessary to support the cross selling that ZBH was telling investors would drive organic revenue growth.

146.    Notwithstanding management's and the Board's contemporaneous knowledge of these problems, Zimmer's executives engaged in a campaign to tout the stock and their purported ability to generate growth as 2016 progressed, even as problems at the Company's facilities persisted.  On July 28, 2016, Dvorak even stated that Zimmer had reached "an important inflection point . . . by beginning to capture the promise of the attractive cross-selling opportunities inherent in our merger, in addition to successfully delivering on our synergy commitments."  At the same time, Zimmer announced *increases* in revenue guidance for fiscal year 2016.

147.    Certain of the defendants in particular stood to gain from these positive statements, which had the effect of propping up the Company's stock price.  Two of the Company's directors – defendants Michael W. Michelson ("Michelson") and Jeffery K. Rhodes ("Rhodes") – served as Board designees of several investment funds sponsored by Kohlberg Kravis Roberts & Co. L.P. ("KKR") and TPG Global, LLC ("TPG"), respectively, two of the world's largest investment companies.  Through various affiliated entities, KKR and TPG each held large ownership stakes in Zimmer that they sought to unload in the Summer of 2016.

148.    A company like ZBH can suffer real reputational damage from a prolonged period of artificially inflated stock that is significantly greater that any regulatory fines or other penalties that it may occur.  *See* Jonathan M. Karloff, D. Scott Lee and Gerald S. Martin, *The Cost to Firms of Cooking the Books*, JOURNAL OF FINANCIAL AND QUANTITATIVE ANALYSIS, Vol. 43, No. 3 (Sept. 2008).  In fact, the reputational penalty is "7.5 times the sum of all penalties imposed through the legal and regulatory system" and "[f]or each dollar that a firm misleadingly inflated its market value, on average, it loses this dollar when its misconduct is revealed, plus an additional $3.08. . . . [of which] $2.71 is due to lost reputation." *Id.* (emphasis added).  This reputational damage increases the longer the public company' stock is artificially high.  *Id.*

149.    Each of the Officer Defendants and Director Defendants, by virtue of his or her position as a director and/or officer, owed to ZBH and its stockholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the control, management, and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  As explained herein, the conduct of the Officer Defendants and Director Defendants complained of herein involves a knowing and culpable violation of their fiduciary obligations by allowing ZHB to enter into various contractual agreements that were violative of the federal securities laws and permitting ZBH to make false and misleading public statements, in absence of good faith on their part, and a reckless disregard for their duties to ZBH and its stockholders that the Defendants were aware or should have been aware posed a risk of serious injury to the Company.

150.    The Officer and Director Defendants breached their contractual obligations and fiduciary duties by failing to heed numerous, obvious red flags of inaccurate financial statements inadequate financial controls and concealment and omission of material adverse information and

by failing to ensure that policies and procedures were in place to ensure the Insider Selling

Defendants and the ZBH fiduciaries who served the interests of the Insider Selling Defendants

were not unjustly enriched with stock sales at inflated prices while in possession of material

adverse non-public.

151.    As a result of the Director and Officers Defendants' breaches detailed herein, the

Company has suffered loss and damage and become the subject of stockholder lawsuits ZBH is

exposed to potentially massive liability.

> **H.    Demand Futility**

152.    Demand would have been futile in this action at the time this suit was filed

because the Board then sitting could not exercise independent and disinterested business

judgment in responding to a demand.  The Board at the time of filing of this suit consisted of

eleven directors (the "Demand Board"), eight of whom have been directors of ZBH since at least

2013.

153.    ZBH's Demand Board eleven members were: defendants Begley, Bernard,

Boudreaux, Farrell, Glasscock, Hagemann, Higgins, Michaelson; and non-Defendants Bryan C.

Hanson (director, President and CEO since 2017); Maria Teresa Hilado and Sayed Jafrey (the

latter two have been directors since 2018).

154.    Demand is further excused because a majority of the Demand Board are

Defendants who at the time of the filing of this lawsuit faced substantial likelihood of liability for

the claims herein.

155.    A majority of the Demand Board who, were Director Defendants who faced

substantial liability under Section 11 of the Securities Act for signing materially misleading and

false Registration Statements.  Under that statute, the Director Defendants herein have only

limited defenses to liability.  Accordingly, these directors would not authorize this suit because it could uncover facts exposing all director Defendants to Section 11 liability potentially for hundreds of millions of dollars that would likely exceed any applicable D&O insurance coverage and thus expose these defendants to potentially ruinous personal liability with no indemnification.  Such liability, constituting a violations of law was/is not immunized by any exculpation provisions of Delaware law or ZBH by-laws and/or charters.  Nor can directors be exculpated for violations of law.  Officers, of course, are not extended any protection under Delaware's exculpation laws.

156.  Defendants Begley, Boudreaux, Glasscock and Hagemann were during 2015 and 2016, the members of ZBH's Audit Committee and charged with assisting the Board relating to ZBH's financial statements and ensuring the accuracy of disclosures to stockholders.  The Audit Committee members were obligated to review and approve the Company's annual Forms 10-K and quarterly Forms 10-Q, other Company filings, as well as the Company's earnings press releases during the Relevant Period.  However, the Audit Committee failed properly executes their duties, causing the Company to make materially false and misleading statements.  As such, Defendants Begley, Boudreaux, Glasscock and Hagemann face an even greater likelihood of liability for their breaches of fiduciary duties, including their duties of good faith, fair dealing, and loyalty, and other illegal acts.

157.  ZBH's annual proxy statement in 2016 described "Board Role In Risk Oversight" as follows:

> The Board of Directors oversees the risk management processes
> that have been designed and are implemented by or executives to
> determine whether those processes are functioning as intended and
> are consistent with our business and strategy.  The Board executes
> its oversight responsibility for risk management directly and

through its committees.  The Board's role in risk oversight has not affected its leadership structure.

The Audit Committee is specifically tasked with overseeing our compliance with legal and regulatory requirements, discussing our risk assessment and risk management processes with management and receiving information on material legal and regulatory affairs, including litigation.  Our head of internal audit, who reports directly to the committee, coordinates our global risk assessment process.  We use this process to identify, assess and prioritize internal and external risks, to develop processes for responding to, mitigating and monitoring risks and to inform the development of our internal audit plan, our annual operating plan and our long-term strategic plan.  The committee receives detailed reports regarding our enterprise risk assessment process and the committee's meeting agendas include discussions of individual risk areas throughout the year.  Members of our management who have responsibility for designing and implementing our risk management processes regularly meet with the committee.  The committee discusses our major financial risk exposures with our CFO and Chief Accounting Officer.  The committee also receives reports from our General Counsel, Chief Information officers and other persons who are involved in our risk management processes.

The full Board considers specific risk topics, including risk-related issues pertaining to laws and regulations enforced by the U.S. Food and Drug Administration and foreign government regulators and risk associated with our strategic plan and our capital structure.  In addition, the board receives detailed regular reports from members of our executive operating committee and other personnel that include discussions of the risks and exposures involved with their respective areas of responsibility.  Further, the Board is routinely informed of developments that could affect our risk profit or other aspects of our business.

158.    The Audit Committee charter (the "Charter") also described the Audit

Committees' duties when directors or executive officers have transactions with ZBH.  In such

case, the Charter admits, the "Audit Committee must review and approve all related person

transactions in which any executive officer, director, director nominee or more than 5%

stockholder has a direct or indirect material interest" and "The Audit Committee may not

approve a related person transaction unless (1) it is in or not inconsistent with our best interest;

and (2) where applicable, the terms of such transaction are at least as favorable to us as could be obtained from an unrelated third party."

159.    In addition, among the Audit Committee's "principal functions" as described in the 2016 Proxy as ". . . overseeing our compliance with legal and regulatory matters and aspects of our risk management processes."

160.    The remaining ZBH Directors of the Demand Board, Michaelson, and Rhodes, were associated with the Insider Selling Defendants parent companies and are thus interested and not independent because Insider Selling Defendants realized unlawful insider selling proceeds of hundreds of millions of dollars from their misuse of inside Company information during the relevant time period.

161.    A majority of the Demand Board members failed to ensure that Insider Selling Defendants complied with the law with respect to their insider sales.  Thus, a majority of the Demand Board was unable to disinterestedly and independently investigate the Claims asserted herein.

162.    In light of the foregoing facts, a majority of the Demand Board faces a substantial likelihood of liability in this case, thus rendering demand on them futile.

163.    As detailed herein, each of the Director Defendants who constituted a majority of the Demand Board who signed the materially false and misleading Offering Materials face a substantial likelihood of liability in this and the stockholders' class action.

164.    The Demand Board's inaction in the face of these numerous red flags, of which they knew or should have known, was a breach of their duties of loyalty.

I.      **Demand Is Excused Because the Conduct of a Majority of the
        Demand Board Was Not a Valid Exercise of Business Judgment**

165.    The Individual Defendants' challenged misconduct constitutes knowingly and

consciously misleading stockholders regarding *systemic* quality system and quality control

failures at the Company's manufacturing facilities (in particular Warsaw North and Warsaw

West), failing to ensure controls to enable the Board to exercise its duty of oversight, ignoring

violations of its own internal audits  in quality control and quality system violations at its

facilities, violating federal regulations, and allowing Zimmer to issue false and misleading

statements to the public regarding the same.

166.    A majority of the Demand Board affirmatively adopted, implemented, and

condoned a business strategy based on deliberate, widespread, blatant violations of federal

regulations.  Breaking the law and ignoring federal regulations and guidelines are not legally

protected business decisions, and such conduct can in no way be considered a valid exercise of

business judgment.  This is particularly true when the purpose behind the affirmative

concealment of these misdeeds is to permit Private Equity Funds associated with certain Board

members to sell stock in the Company at an artificially inflated price.  Accordingly, demand on

the Board is excused.

167.    A derivative claim to recoup damages for harm caused to the Company by

unlawful activity represents a challenge to conduct that is outside the scope of the Board's

business judgment – conduct for which the Board should face potential personal liability.

Allowing Zimmer to violate laws and federal regulations, or looking the other way while

refusing to prevent others under the Board's control from committing these wrongful acts (and

profiting from them), are all forms of misconduct that cannot under any circumstances by

examples of legitimate business conduct.  The protections of the "business judgment rule" do not

extend to such malfeasance.  Nor can such malfeasance ever constitute the "good faith" required of corporate fiduciaries.

## COUNT I

### AGAINST THE INSIDER SELLING DEFENDANTS TO RESCIND THE 2014 STOCKHOLDERS AGREEMENT AND FOR RECISSORY DAMAGES UNDER SECTION 29(b) OF THE EXCHANGE ACT

168.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as through fully set forth herein.

169.    In connection with the Merger, the Private Equity Funds entered into a Stockholders Agreement that, *inter alia,* entitled the Private Equity Defendants to designate two members of ZBH's Board.  Pursuant to the Stockholders Agreement, the Private Equity Funds exercised their power under the Stockholders Agreement and designated Defendants Michelson and Rhodes to the Board of Directors.[15]

170.    The Insider Selling Defendants were parties to the Stockholders Agreement, which was described in the 2016 Proxy as:

> In connection with our entry into the merger agreement related to our acquisition of Biomet, we entered into a stockholder agreement dated as of April 24, 2014 and amended as of March 30, 2015 with LVB Holding and the Sponsor Funds.  The Sponsor Funds are

---

[15]    The rights of the Private Equity Funds to designate directors pursuant to the Stockholders Agreement terminated on June 16, 2016, the closing date of the June 2016 Offering, due to the Private Equity Funds beneficially owning at that time less than 30% of the shares of ZBH common stock acquired by the Private Equity Funds as consideration in the Merger.  As a result, the Stockholders Agreement required the Private Equity Funds to cause their designated directors, Michelson and Rhodes, to immediately resign from the Board of Directors unless otherwise consented to by a majority of the other directors.   However, ZBH temporarily waived such obligation to allow the Board the opportunity to further discuss its future composition and, following such discussions, the other directors unanimously consented on July 15, 2016, to Michelson and Rhodes continuing to serve as directors of ZBH.  Consequently, the Private Equity Defendants were not obligated to cause Michelson and Rhodes to resign from the Board of Directors.

affiliates of The Blackstone Group, L.P. ("Blackstone"), Goldman Sachs & Co. ("Goldman Sachs"), KKR & Co., L.P. ("KKR") and TPG Global, LLC ("TPG").  The stockholders agreement became effective as of the closing date of the merger, June 24, 2015, and sets forth certain governance arrangements and contains various provisions relating to, among other things, representation on our Board, the acquisition of additional equity interests in us, prohibitions on taking certain actions relating to our company, transfer restrictions, voting arrangements and registration rights.

The directors designated by the Principal Stockholder investors are granted certain information and access right to information related to the management, operations and finances of us and our subsidiaries, as and when provided to our non-management directors.  The Principal Stockholder investors are obligated to keep confidential certain information of ours, subject to certain exceptions, including the ability to share confidential information with the Sponsor Funds.

171.    Section 1.6 of the Stockholders Agreement provided for "Information Rights." Specifically, that provision granted the Private Equity Designated Directors certain information and access rights, including, to information related to the management, operations and finances of ZBH and its subsidiaries, as and when provided to the non-management directors.  Under the Stockholders Agreement, the Private Equity Designated Defendants were obligated to keep confidential certain ZBH information, subject to certain exceptions, including the ability to share confidential information with the Private Equity Funds and its affiliates.[16]

172.    Importantly, the Stockholders Agreement provided the directors designated by the Private Equity Funds) with unfettered insight into all the material provided to the Board,

---

[16]   The Stockholders Agreement contained a number of other provisions that applied during 2016 until the Stockholders Agreement automatically terminated on August 12, 2016, the closing date of the August 2016 Offering and the date on which the Private Equity Funds no longer owned ZBH common stock.  This included the provision providing the ability to share confidential information with the Private Equity Defendants and their affiliates.

including all materials provided to each Board committee, and the right to attend all committee meetings.  Specifically, the Stockholders Agreement provided:

> [T]he Company and its Subsidiaries will give notice of each meeting of any committee of the Board (at the same time such notice is provided to any committee member) to [Private Equity Designated Directors], *provide all information provided to members of each such committee simultaneously to [Private Equity Designated Directors] and permit the [Private Equity Designated Directors] to attend all such committee meetings as an observer.*

(Emphasis added.)

173.   The Stockholders Agreement also provided in relevant part:

ARTICLE IV

REGISTRATION

4.1 Demand Registrations.

(a)  Demand Stockholders ("Requesting Stockholders") shall be entitled to make unlimited written request of the Company (each, a "Demand") shall be entitled to make unlimited written request of the Company (each, a "Demand") for registration under the Securities Act of an amount of Registrable Securities then held by such Requesting Stockholders that equals or is greater than the Registrable Amount (a "Demand Registration"); provided that the Demand Stockholders shall not make an aggregate of more than four (4) Demands in any single calendar year. Thereupon the Company will, subject to the terms of this Agreement, use its reasonable best efforts to effect the registration as promptly as reasonably practicable under the Securities Act of:

(i)  the Registrable Securities which the Company has been so requested to register by the Requesting Stockholders for disposition in accordance with the intended method of disposition stated in such Demand;

all to the extent necessary to permit the disposition (in accordance with the intended methods thereof) of the Registrable Securities and the additional shares of Company Common Stock, if any, to be so registered.

(d) Demand Registrations shall be on such appropriate registration form of the Commission as shall be selected by the Company and reasonably acceptable to the Requesting Stockholders.

4.9 <u>Registration Indemnification</u>.

(a) The Company agrees, without limitation as to time, to indemnify and hold harmless, to the fullest extent permitted by Applicable Law, each Selling Stockholder and its Affiliates and their respective officers, directors, members, shareholders, employees, managers, partners, accountants, attorneys and agents and each Person who controls (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act) such Selling Stockholder or such other indemnified Person and the officers, directors, members, shareholders, employees, managers, partners, accountants, attorneys and agents of each such controlling Person, each underwriter (including, for the avoidance of doubt, any Selling Stockholder that is deemed to be acting as an underwriter under Applicable Law), if any, an each Person who controls (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act) such underwriter , from and against all losses, claims, damages, liabilities, costs, expenses (including reasonable and documented expenses of investigation and reasonable and documented attorneys' fees and expenses), judgments, fines, penalties, charges and amounts paid in settlement (collectively, the "<u>Losses</u>"), as incurred, arising out of, caused by, resulting from or relating to any untrue statement (or alleged untrue statement) of a material fact contained in any registration statement, prospectus or preliminary prospectus or Free Writing Prospectus or any amendment or supplement thereto or any omission (or alleged omission) of a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading and (without limitation of the preceding portions of this <u>Section 4.9(a)</u>) will reimburse each such Selling Stockholder, each of its Affiliates, and each of their respective officers, directors, members, shareholders, employees, managers, partners, accountants, attorneys and agents and each such Person who controls each such Selling Stockholder and officers, directors, members, shareholders, employees, managers, partners, accountants,

> attorneys and agents of each such controlling Person, each
> such underwriter and each such Person investigating and
> defending or settling any such claim, Loss, damage,
> liability or action, excepts, in each of the cases described in
> this <u>Section 4.9(a)</u>, insofar as the same are caused by any
> information furnished in writing to the Company by any
> other party expressly for use therein.

174.    Section 29(b) of the Exchange Act, 15 U.S.C. § 78cc(b), provides in pertinent part

as follows:

> Every contract made in violation of any provision of this chapter or
> of any rule or regulation thereunder and every contract . . .
> heretofore on hereafter made the performance of which involves
> the violation of, or the continuance of any relationship or practice
> in violation of any provision of this chapter or any rules or
> regulation thereunder, shall be void . . . as regards the rights of any
> person who in violation of any such provision, rule or regulation
> shall have made or engaged in the performances of contract.

175.    The principle that corporate contracts can be avoided under Section 29 of the

Exchange Act is well-established, as recognized by the United States Supreme Court in *Mills v.*

*Electric Auto-Lite*, 356 U.S. 375, 386-87 (1970) (footnotes omitted), "This language establishes

that the guilty party is precluded from enforcing the contract against an unwilling innocent

party."

176.    The Stockholders Agreements permitted the Insider Seller Defendants to violate

the provisions of the Exchange Act and were thus inherently violative of the federal securities

laws.

177.    As a result of the foregoing ZBH is entitled to recission of the Stockholders

Agreements and contracts and/or return of all monies and benefits previously paid thereunder.

**COUNT II**

**AGAINST DEFENDANTS BEGLEY, BERNARD, BISARO,
BOUDREAUX, COLLINS, DVORAK, FARRELL, FLORIN,
GLASSCOCK, HAGEMANN, HIGGINS, MARSHALL, JR.,
MICHELSON, PICKETT, COLLINS, AND RHODES,
FOR CONTRIBUTION UNDER 15 U.S.C. § 77 k(f) And 21D(5)(A)-(D) AND 8
FOR VIOLATIONS OF SECTIONS 10(b) AND 21D OF THE EXCHANGE ACT**

178.     Plaintiffs incorporate by reference and reallege each and every allegation

contained above, as though fully set forth herein.

179.     Plaintiffs assert this Count against the Defendants who are named as defendants in

related securities class actions.  The conduct of these Defendants, as described herein, has

exposed the Company to significant liability under various federal securities laws by their

disloyal acts.

180.     ZBH is named as a Defendant in related securities class actions that allege acts

and conduct which constitute violations of Section 11 of the Securities Act and Section 10(b) of

the Exchange Act.  The Company is alleged to be liable to private persons, entities, and/or

classes by virtue of many of the same facts alleged herein.  These suits have caused ZBH to incur

substantial costs for defense and settlement.  If ZBH is found liable for violating the federal

securities laws, the Company's liability will arise in whole or in part from the intentional,

knowing, or reckless acts or omission of all or some of the Defendants as alleged herein, who

have caused the Company to suffer substantial harm through their disloyal acts.  The Company is

entitled to contribution and indemnification from these Defendants in connection with all claims

that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

181.     As officers, directors, and otherwise, Defendants had the power to ability to, and

did, control over influence, either directly or indirectly, ZBH's general affairs, including the

content of its public statements, and has the power or ability to directly or indirectly control or

influence the specific corporate statements and conduct that violated Section 10(b) of the

Exchange Act and SEC Rule 10b-5.

182.    Defendants Christopher B. Begley, Betsy J. Bernard, Paul M. Bisaro, Gail K.

Boudreaux, Tony W. Collins, David C. Dvorak, Michael J. Farrell, Daniel P. Florin, Larry

Glasscock, Robert A. Hagemann, Arthur J. Higgins, Robert J. Marshall, Jr., Michael W.

Michelson, Cecil B. Pickett, and Jeffrey K. Rhodes are liable under Section 11 k (f) of the

Securities Act and/or section 21D of the Exchange Act, which provides for claims of

contributions from the same of Individual Defendants named herein and in the *Shah* suit.

183.    Defendants Christopher B. Begley, Betsy J. Bernard, Paul M. Bisaro, Gail K.

Boudreaux, Tony W. Collins, David C. Dvorak, Michael J. Farrell, Daniel P. Florin, Larry

Glasscock, Robert A. Hagemann, Arthur J. Higgins, Robert J. Marshall, Jr., Michael W.

Michelson, Cecil B. Pickett, Jeffrey K. Rhodes have damaged the Company and are liable to the

Company for contribution and/or indemnification.

184.    No adequate remedy at law exists for Plaintiffs by and on behalf of the Company.

## COUNT III

### AGAINST THE OFFICER DEFENDANTS TO RESCIND
### THEIR EMPLOYMENT CONTRACT COMPENSATION
### UNDER SECTION 29(B) OF THE EXCHANGE ACT

185.    Plaintiffs incorporate by reference and reallege each and every preceding

allegation set forth above, as though fully set forth herein.

186.    Exchange Act Section 29(b), 15 U.S.C. § 78cc(b), provides in pertinent part as

follows:

> Every contract made in violation of any provision of this chapter or
> of any rule or regulation thereunder and every contract . . .
> heretofore on hereafter made the performance of which involves
> the violation of, or the continuance of any relationship or practice
> in violation of any provision of this chapter or any rules or

> regulation thereunder, shall be void . . . as regards the rights of any
> person who in violation of any such provision, rule or regulation
> shall have made or engaged in the performances of contract.

187.    The principle that corporate contracts can be avoided under the securities laws is well-established, as recognized by the United States Supreme Court in *Mills v. Electric Auto-Lite*, 356 U.S. 375, 386-87 (1970) (footnotes omitted), "This language establishes that the guilty party is precluded from enforcing the contract against an unwilling innocent party."

188.    Section 29(b) of the Exchange Act provides equitable remedies that include, among other things, provisions allowing for the voiding of contracts where the performance of the contract involved violation of any provision of the Exchange Act.

189.    The Director Defendants violated the federal securities laws while performing their duties under various agreements they had with ZBH for director services, and ZBH is entitled to rescission of those agreements.

190.    ZBH was and is an innocent party with respect to Officer Defendants' Exchange Act violations.

191.    The Officer Defendants' compensation in 2015, 2016 and 2017 included performance related components such as "Annual Cash Incentive Plan;" and "Biomet Merger Cash Integration Incentive Plan."

192.    In the 2016 Proxy, ZBH explained its rationale for the executive officer compensation awards:

> Synergy targets for the post-closing period of July 1, 2015 –
> December 21, 2015 were exceeded and growth and transformation
> milestones were fully achieved.

193.    ZBH cited six "2015 Achievements and Value Creation" as factors in the compensation committee's decisions on compensation for the Officer Defendants:

    (a)  Net sales for the year were $6.0 billion, an increase of 28.3% over 2014;

    (b)  Diluted earnings per share ("EPS") for 2015 were $6.90 on an adjusted basis, an increase of 7.8% over 2014;

    (c)  In the second half, we over delivered against our initial net synergy targets;

    (d)  During the Fourth Quarter, we substantially completed integration of the Zimmer and Biomet global commercial organization;

    (e)  Our total shareholder return ("TSR") for the three year period end December 31, 2015 was 15.49%; and

    (f)  We focused significant resources on our quality and operational excellence initiatives, investments intended to achieve excellence in our global quality infra.

194.    In 2016, executives were also given "Special One-Time Awards in Connection with the Biomet Merger."

195.    For 2015, defendant Dvorak's total compensation was $11,392,178.00. Defendant Flom's 2015 total compensation was $5,514,954.00.

196.    Similarly for 2016, ZBH noted "improvements in sales," "operating profit," "operating cash flow," "EPS," "strategic investments," "Quarterly and Operational Excellence" and "Net Operating Synergies" from the June 2015 merger as factors for the compensation award under contracts whose rescission is sought herein.

197.    In 2016 defendant Dvorak was paid total compensation of $11,492,363.00. Defendant Florin's total acquisition was $3,293,400.00 in 2016.

198.    In 2017 defendant Dvorak paid $8,777,220.00 for his half year of employment in 2017, until he was replaced by Florian in July 2017.  Defendant Florin earned $4,886,341.00 in 2017.

199.    Defendant Collins was a high ranking executive officer of ZBH in 2015, 2016, 2017 but his compensation was not disclosed.

200.    Plaintiffs, on behalf of ZBH, seek rescission of the contracts between the Director Defendants and ZBH due to these defendants' violations of the Exchange Act while performing their job duties.

201.    As a result of the foregoing, ZBH is entitled to recission of those agreements and contracts and/or return of all monies and benefits previously paid thereunder.

## COUNT IV

### AGAINST THE DIRECTOR DEFENDANTS TO RESCIND THEIR COMPENSATION UNDER SECTION 29(B) OF THE EXCHANGE ACT

202.    Plaintiffs incorporate by reference and reallege each and every preceding allegation set forth above, as though fully set forth herein.

203.    Section 29(b) of the Exchange Act, 15 U.S.C. § 78cc(b), provides in pertinent part as follows:

> Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder and every contract . . . heretofore on hereafter made the performance of which involves the violation of, or the continuance of any relationship or practice in violation of any provision of this chapter or any rules or regulation thereunder, shall be void . . . as regards the rights of any person who in violation of any such provision, rule or regulation shall have made or engaged in the performances of contract.

204.    The principle that corporate contracts can be avoided under the securities laws is well-established, as recognized by the United States Supreme Court in *Mills v. Electric Auto-Lite*, 356 U.S. 375, 386-87 (1970) (footnotes omitted), "This language establishes that the guilty party is precluded from enforcing the contract against an unwilling innocent party."

66

205.    Section 29(b) of the Exchange Act provides equitable remedies that include, among other things, provisions allowing for the voiding of contracts where the performance of the contract involved violation of any provision of the Exchange Act.

206.    The Director Defendants violated the securities laws while performing their duties under various agreements they had with ZBH for director services, and ZBH is entitled to rescission of those agreements.

207.    ZBH was and is an innocent party with respect to Director Defendants' Exchange Act violations.

208.    In the relevant period, the Director Defendants were paid the following compensation:

|           | <u>2015</u>   | <u>2015</u>   | <u>2017</u>   |
|-----------|---------------|---------------|---------------|
| Begley    | $283,688.00   | $287,859.00   | $292,553.00   |
| Bernard   | $296,670.00   | $300,786.00   | $307,112.00   |
| Bisaro    | $281,362.00   | $284,902.00   | $48,933.00    |
| Boudreaux | $283,317.00   | $287,459.00   | $292,142.00   |
| Farrell   | $280,654.00   | $284,591.00   | $289,190.00   |
| Glasscock | $446,629.00   | $450,894.00   | $455,147.00   |
| Hagemann  | $302,289.00   | $307,619.00   | $316,648.00   |
| Higgins   | $306,288.00   | $311,925.00   | $318,598.00   |
| Michelson | $71,353.00    | $283,730.00   | $288,304.00   |
| Pickett   | $297,274.00   | $301,202.00   | $306,543.00   |
| Rhodes    | $71,302.00    | $283,295.00   | $287,436.00   |

209.     Plaintiffs, on behalf of ZBH, seek rescission of the contracts between the Director Defendants and ZBH due to these defendants' violations of the Exchange Act while performing their job duties.

210.     As a result of the foregoing ZBH is entitled to rescission of those agreements and contracts and/or return of all monies and benefits previously paid thereunder.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs demands judgment as follows:

A.     Determining that this action is a proper derivative action maintainable under law and demand is excused;

B.     Awarding, against all Director and Officer Defendants and in favor of ZBH, the return of contractual benefits to ZBH;

C.     Awarding to ZBH as rescissory damages under Section 29(b) of the Exchange Act for damages arising out of their contracts subject to Section 29(b) as alleged herein and voiding such contracts and eliminating any continuing liability of ZBH to any parties thereto;

D.     Disgorgement of insider trading profits from the Insider Selling Defendants, and from their affiliates, and ordering disgorgement of all profits, benefits and other compensation obtained by their insider trading and further profits flowing therefrom;

E.     Awarding ZBH judgment against the Individual Defendants and/or Insider Selling Defendants on the contribution claims asserted herein;

F.     Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: September 14, 2020

**COOCH AND TAYLOR, P.A.**

*s/ Blake A. Bennett*
Blake A. Bennett (#5133)
The Brandywine Building
1000 West Street, 10th Floor
Wilmington, Delaware 19801
(302) 984-3800

*Liaison Counsel for Plaintiffs*

**SQUITIERI & FEARON, LLP**
Lee Squitieri
32 East 57th Street, 12th Floor
New York, New York 10022
(212) 421-6492

**GARDY & NOTIS, LLP**
James S. Notis
Meagan A. Farmer
126 East 56th Street, 8th Floor
New York, New York 10022
(212) 905 0509

*Lead Counsel for Plaintiffs*